In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-3401, 04-4159, 05-1687

SUNITA PATEL, KAMARKANT PATEL,
PALLAVI PATEL, and KALPANA PATEL,

*Petitioners*,

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

Petitions for Review from the
Board of Immigration Appeals.
Nos. A70 551 082, A70 551 086,
A70 551 085, and A70 551 084

ARGUED OCTOBER 19, 2005,
SUBMITTED FEBRUARY 1, 2006Œ—DECIDED MARCH 30, 2006

---

Œ Because these petitions for review are related, the Court on its
own motion has consolidated them for disposition. Petitioner
Sunita Patel's petition, docketed as Nos. 04-3401 and 04-4159,
was argued before this panel on October 19, 2005. On February 1,
2006, the petitions of Petitioners Kamarkant, Pallavi, and
Kalpana Patel were submitted and docketed as No. 05-1687. The
Court has concluded that oral argument is unnecessary in
the latter cases; those petitions are therefore submitted on the
briefs. See Fed. R. App. P. 34(a)(2).

Before MANION, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.*  These petitions present, in the aggregate, the claims of four members of the Patel family who are seeking asylum, withholding of deportation, and relief under the Convention Against Torture (CAT). In Nos. 04-3401 and 04-4159, Sunita Patel is petitioning for review of two decisions of the Board of Immigration Appeals (BIA): the first one denied her motion to reopen her asylum proceedings, and the second one denied her motion to reconsider the denial of the motion to reopen. In No. 05-1687, Kamarkant Patel (Sunita's father), his wife Pallavi Patel, and his oldest daughter Kalpana Patel, petition for review of the BIA's decision denying their motions to reopen their cases so that they might reapply for asylum, withholding of deportation, and relief under the CAT. All four argue, in essence, that their experience with the immigration system of this country has resembled nothing as much as the bureaucracy in Franz Kafka's *Castle*, where no answers are ever consistent, contradictions abound, and frustration is the only outcome. While we have some sympathy with their plight, it is not entirely of the Board's making. Moreover, the relief they are seeking lies within the Board's discretion, and we cannot say that the Board abused that discretion in any of these cases. We therefore deny the petitions for review.

# I

A.  Initial Proceedings

Kamarkant Patel was born on June 12, 1953, in Lichtenburg, South Africa; he is of Indian/Asian ancestry, as are approximately 2.5% of the people in South Africa, according to the CIA's World Factbook. See http://www.cia.gov/publications/factbook/geos/sf.html.  Pallavi Patel, Kamarkant's wife, was born in India, but she later became a naturalized South African citizen. The couple

have three daughters, all of whom were born in South Africa: Kalpana, Minal, and Sunita. As members of the Indian minority in that country, the family had been a target of violence, persecution, and harassment from both blacks and whites in apartheid South Africa. (South Africa recognizes April 27, 1994, as its Freedom Day; not until then was the apartheid regime at last officially ended. *Id.*) When the grocery store by which the Patels made their living was burned to the ground, they decided that they had no choice but to flee. They entered the United States on August 23, 1991, on visitors' visas, and immediately retained an attorney, Archana O'Chaney, to help them pursue asylum claims.

With the assistance of counsel, Kamarkant filed his asylum application on August 8, 1992, naming himself as the primary applicant and his wife and three daughters (then ages nine, 12, and 13) as derivative applicants. Initially, the asylum officer at the Bureau of Human Rights and Humanitarian Affairs of the Department of State prepared an Assessment Sheet, in which he found the Patels' story to be credible and recommended that they be granted asylum based on their race and nationality. No final action took place, however, until October 1994, when the former Immigration and Naturalization Service (INS) issued a notice of intent to deny asylum. The issuing officer also thought that Kamarkant's testimony about the hardships the family had suffered in South Africa was credible, but he concluded that country conditions had changed so radically since the family's departure that it was unlikely that their problems would continue if they returned. Unfortunately, O'Chaney never informed them about this turn of events, and thus they were deprived of the opportunity to present additional evidence to the INS.

In the summer of 1996, the INS formally denied Kamarkant's application for asylum, and all five members

of the family were served individually with Orders To Show Cause why they should not be deported. They responded with a second joint asylum application in March 1997. That led to a hearing on October 1, 1997, at which Kamarkant testified. He stated that he had owned a grocery store in South Africa. On several occasions, soldiers or other people had accosted him on the street and stolen his groceries or his money. His car was stolen and burned; when he reported this incident to the police, they failed to create a formal report about it. Kamarkant admitted that the police had not harmed, bothered, or harassed him, but that on numerous occasions soldiers had entered his store and taken groceries without paying. In June 1991, the store was burned "by the natives" (as he put it). It was not safe for him to drive his children to school, he reported, because sometimes "natives" would get into the car with him and make him give them rides. He and his family were also subjected to threats, including one threat to rape Sunita, then five years old.

At the conclusion of this hearing, the Immigration Judge (IJ) denied the petition for asylum and withholding of deportation, but he granted the family voluntary departure. At the family's request, O'Chaney filed a timely notice of appeal to the BIA from that decision. That notice indicated that they would be filing a separate brief in support of their appeal, but no such brief was ever filed. Years later, on March 8, 2002, the BIA summarily dismissed the appeal for failure to file a separate brief or reasonably to explain the absence of the brief. The Board did, however, confirm the IJ's decision to grant the family voluntary departure. Once again, the family never received notice of the BIA's decision, either from O'Chaney or otherwise. Consequently, they failed to depart within the permitted time period and thus violated the terms of the Board's order. In June 2002, the BIA issued a final order of deportation *in absentia.*

### B.  Minal Patel

At this point, the paths of the various family members diverged. We begin with the one family member not involved in these petitions, Minal. Minal married a United States citizen in July 1999 and applied a few months later for an adjustment of status based on her husband's immediate-relative petition. Those applications also languished for a couple of years, but in August 2002 Minal received notice that her request for adjustment of status could not be adjudicated because she was under an order of deportation. At that point, Minal sought new counsel and filed a request under the Freedom of Information Act (FOIA) for a copy of her immigration file. The government apparently responded promptly and sent the file to her; upon reviewing it, she learned that the order of deportation had indeed been entered when her family's appeal was dismissed in June 2002. In November 2002, Minal moved to reopen her asylum proceedings, alleging ineffective assistance of counsel. She also renewed her request for adjustment of status. She was successful: the BIA ruled that she was entitled to equitable tolling of the time limit for motions to reopen and it reopened her case. In February 2004, she was granted adjustment of status.

### C.  Sunita Patel

In the meantime, Sunita had also married a United States citizen, in February 2002; she applied within a month to have her status adjusted. Despite the action on Minal's similar application in late 2002, the agency did not inform Sunita at that time that she too could not pursue adjustment of status while she was under the June 2002 order of deportation. Only in May 2004, during an interview with immigration officers in connection with her application, was she told that the application could not be processed because of the order of deportation. Around

the same time, she received a letter to the same effect from the agency. Sunita retained the same lawyer who had succeeded in Minal's case, and filed a motion to reopen her own case within 30 days of the government's letter. Sunita's motion was essentially identical to Minal's, and also relied on ineffective assistance of counsel as the basis for raising an independent asylum claim. Underscoring the relatedness of the two cases, Sunita attached a number of documents to her motion that had been submitted in Minal's case, including affidavits from Kamarkant and Minal attesting to the negligence of the former lawyer. In July 2004, Sunita received a notice that her husband's immediate-relative petition had been approved; she promptly amended her motion to reopen to have that fact taken into consideration.

In contrast to Minal's success in her petition to reopen, Sunita met with failure. The Board first observed that she had failed to satisfy the time limit for motions to reopen found in 8 C.F.R. § 1003.2(c)(2), based on 8 U.S.C. § 1229a(c)(7)(C)(ii). It concluded that equitable tolling was not appropriate for Sunita, because it inferred from all the facts that Sunita had been aware since the time Minal received the response to her FOIA request that she was under an order of deportation. Unlike Minal, who acted promptly at that point, Sunita had waited nearly two years before filing her own motion to reopen—an action the Board deemed inconsistent with the exercise of due diligence. This is the first order Sunita has asked us to review, in No. 04-3401.

In addition to petitioning this court for review, Sunita also filed a motion to reconsider with the Board. In that motion, she argued that there was no evidence that any-one in the family except Minal had known of the final deportation order, and that, in any case, she had no reason to believe that it covered her, because the documents obtained through the FOIA request related only to Minal. She also asserted that she had been so busy working at the

relevant time that she "never had the time to speak to my parents, let alone to my sister Minal" and that she "never knew anything about what was going on with my sister."

The Board was unpersuaded, and in November 2004 it denied Sunita's motion to reconsider the refusal to reopen. It pointed to statements in a 2002 affidavit from Minal, created for her own case, indicating that Minal knew that the March 2002 order affected the entire family and that it was reasonable to conclude that she had shared that information with her father. The Board also noted that Sunita and her husband were living with Kamarkant during the period when former counsel's ineffective assistance was discovered. Sunita's petition for review of this decision is No. 04-4159.

### D. Kamarkant, Pallavi, and Kalpana Patel

The other three members of the Patel family submitted their motion to reopen to the Board on December 16, 2004. They argued first that the lateness of their filing should be excused because of the ineffectiveness of their original lawyer. In addition, they asserted that country conditions had changed for the worse for the Indian minority in South Africa since the 1997 hearing before the IJ. Finally, they claimed that Pallavi had become stateless, as a result of the length of time she had been absent from South Africa and her earlier decision to relinquish her Indian citizenship when she became a naturalized South African citizen.

The Patels insisted, in this petition, that they did not realize that Minal's problems extended to the rest of them. In part, they relied on the advice that O'Chaney gave them when Minal received her first letter, to the effect that the letter was wrong and there could not have been an *in absentia* order of deportation entered. With respect to country conditions in post-apartheid South Africa, they

submitted news articles reporting that the Indian
minority felt marginalized and excluded from oppor-
tunities that were being reserved for the black majority.
Other articles, as well as the State Department Report on
Country Conditions issued February 24, 2004, described
increasing violence in the country as a whole.

The Board considered each of these points, but in the
end it rejected the motion to reopen. It first pointed out that
the motion was untimely, as it was not filed within 90 days
of the Board's March 8, 2002, decision. Next, it held that
equitable tolling was not appropriate, because the Patels
had not acted with due diligence after they discovered that
the Board had acted in March 2002. As in Sunita's case, the
Board relied on the affidavit from Minal recounting that she
discussed with her father all of the documents she received
in response to her FOIA request. Indeed, Minal's affidavit
said at one point that "I and my family lost our right to
appeal our cases." The Board thus found that Kamarkant,
and by extension Pallavi and Kalpana, knew about the
March 2002 decision no later than October of 2002, more
than two years before they filed their motion to reopen.

Turning to country conditions in South Africa, the Board
noted that the evidence the Patels submitted described
incidents of general strife, not persecution against
Indians. In fact, the Board pointed out, "the respondents
submitted an article explaining how the Indian com-
munity in South Africa is playing a major role in the post-
apartheid economy." On this record, the Board concluded,
there was no reason to think that changed circumstances
would operate in the Patels' favor. Finally, the Board
held that Pallavi's alleged stateless status was not a reason
for granting relief. It also pointed out that the fax Pallavi
had submitted to show that she had lost her South African
citizenship went on to say that if she complied "with section
13(3)(a)(1) of the permit for permanent residence or exemp-
tion thereof," she could apply for "resumption of [her] South

African citizenship." Case No. 05-1687 is the combined petition for review on behalf of Kamarkant, Pallavi, and Kalpana.

## II

We have before us two motions to reopen and one motion to reconsider. Although these two kinds of motions are similar, we have described their distinct functions as follows:

> A motion to reconsider asks that a decision be reexamined in light of additional legal arguments, a change of law, or an argument that was overlooked earlier, while a motion to reopen asks for reconsideration on the basis of facts or evidence not available at the time of the original decision, such as changed country conditions. So whereas a motion to reconsider rehashes arguments that should have been presented the first time around, a motion to reopen calls attention to potentially vital information that could not have been presented earlier. *Kurzban's Immigration Law Sourcebook* 738, 744 (8th ed. 2002).

*Patel v. Ashcroft*, 378 F.3d 610, 612 (7th Cir. 2004). The standard of review, however, is identical: we review both kinds of motion only for abuse of discretion. *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 724 (7th Cir. 2005); *Singh v. Gonzales*, 404 F.3d 1024, 1027 (7th Cir. 2005). We address Sunita's two petitions first, and then the petition for the remainder of the family.

Sunita first argues that the Board erred as a matter of law in applying the due diligence standard to her petition to reopen. Because her claim is based ultimately on ineffective assistance of counsel, she asserts that the Board should have looked instead to the various factors spelled out in *In re Lozada,* 19 I. & N. Dec. 637 (BIA 1988), notably including

prejudice. But this argument confuses the substantive criteria for succeeding on an ineffective assistance of counsel claim with the procedural rules that must be satisfied, including the rules governing the time for filing various motions. The Board would indeed turn immediately to the *Lozada* test if the motion to reopen were filed within the 90 days permitted by the regulations. With an untimely motion, in contrast, the alien must first show that her situation warrants equitable tolling of the time limits, and equitable tolling in turn requires a showing of due diligence. See *Ray v. Gonzales*, 439 F.3d 582, 589 (9th Cir. 2006); *Albillo-De Leon v. Gonzales*, 410 F.3d 1090, 1099-1100 (9th Cir. 2005); *Pervaiz v. Gonzales*, 405 F.3d 488, 489-90 (7th Cir. 2005); *Chen v. Gonzales*, 437 F.3d 267, 269 (2d Cir. 2006); *Iavorski v. INS*, 232 F.3d 124, 134 (2d Cir. 2000).

Next, Sunita takes issue with the Board's conclusion that she failed to demonstrate due diligence. This amounts to a factual disagreement with the inference the Board drew from Minal's affidavit and the other circumstances surrounding the delivery of the FOIA documents. On this record, we cannot say that the Board abused its discretion when it concluded that the circumstantial evidence showed that Sunita knew that the March 2002 order had been issued, and that it covered the entire family. Moreover, even if Sunita had known only that Minal was subject to a deportation order resulting from the proceeding that had covered all five of them, this would have been enough to trigger a duty of inquiry on her part. "Equitable tolling requires a court to consider whether a reasonable person in the plaintiff's position would have been aware of the *possibility* that he had suffered" an injury. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860-61 (7th Cir. 2005) (emphasis in original). Contrary to Sunita's position, she did not have to acquire actual knowledge of all of the consequences of the Board's final order before the clock could start to run for equitable tolling purposes.

Other arguments Sunita presents concern the relation between her application for adjustment of status and her action (or lack thereof) after the final order of deportation. It is true, to her credit, that she was not trying to avoid the attention of the immigration authorities. To the contrary, within a month of her February 2002 marriage—that is to say, either before or contemporaneously with the March 2002 order of deportation—she applied for adjustment of status based on her husband's immediate-relative petition. We find it disturbing when the right hand within the immigration bureaucracy apparently does not know what the left hand is doing. Had anyone noticed the coincidence of these two proceedings, Sunita could have been notified right away that the adjustment application could not be adjudicated because of the deportation order; she could have filed for reopening within the permitted 90-day period; and her fate might have paralleled Minal's. Notwithstanding the circumstances of her adjustment application, however, which were known to the Board, the Board was not required to find that the government was estopped from deporting her or that its delay in connecting the two proceedings together violated her due process rights. Her case is not the same as *Singh v. Reno*, 182 F.3d 504 (7th Cir. 1999), in which we held that the INS's delay of more than six years led to a violation of the petitioner's due process rights. There, the applicable law had changed during the period of delay, and we found "crucial significance" in the petitioner's diligent pursuit of relief. *Id.* at 510-11.

Last, Sunita argues that the Board should have concluded that changed country conditions exempted her from the time limits ordinarily applicable to motions to reopen, by virtue of 8 U.S.C. § 1229a(c)(7)(C)(ii). The government responds that she failed to raise this point adequately before the Board. Whether or not this is so, her arguments before this court are insufficient to bring this statute into

play. She needed to show, as her other family members attempted to do in their petition, that conditions in South Africa had changed for persons of Indian ancestry between the time of the Board's decision and the motion to reopen. See *Sivaainkaran v. INS*, 972 F.2d 161, 166 (7th Cir. 1992). Sunita did not do so; she focused instead on the immigration officer's determination in 1994 that conditions in the country had changed so much since the favorable preliminary determination that the family's claim had to be denied. Although she states, in a conclusory fashion, that conditions are just as bad for Indians today in South Africa, she presents no evidence strong enough to compel a finding that the Board's decision represents an abuse of discretion.

We conclude, therefore, that the Board acted within its authority when it concluded first that Sunita's motion to reopen had to be dismissed as untimely, and second that her motion to reconsider that decision failed to demonstrate that the Board had erred in refusing to reopen the case.

Our conclusion with respect to the combined petition filed by Kamarkant, Pallavi, and Kalpana Patel is the same. We have already reviewed the important points contained in the Board's order in their cases. The question before us, once again, is not whether we as an initial matter might have found equitable reasons to relieve these three individuals from the time limits for filing a motion to reopen; it is whether the Board abused *its* discretion in refusing to do so. The evidence with respect to the time when Kamarkant and the rest of the family learned of the March 2002 order of deportation is the same as the evidence in Sunita's case. Whether the Board thought that the outer limit was September or October of 2002 is immaterial, given the fact that these three petitioners did not file their motion to reopen until December 2004. Once one accepts the Board's factual finding that the family was aware of its status as of the fall of 2002—a finding that is a permissible one on this record, even if not the only possible one—the further

conclusion that the Board drew of lack of diligence follows easily. The Board's decision that the record did not show the kind of changed country conditions for South Africa that would relieve petitioners of the time constraints is also a reasonable one.

Finally, although counsel argues strongly that there is no guarantee that South Africa will accept Pallavi, since (counsel asserts) no country right now will issue her a passport, the Board's primary ruling on this point was that statelessness is not a reason by itself for granting asylum or withholding of removal. At this point, the Department of Homeland Security has the burden of arranging for Pallavi's transportation back to South Africa, or to any other country that is willing to accept her. As the Supreme Court recently held, advance word from the country of destination that it will admit the individual is not strictly required by the statute. See *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005).

We have considered the other arguments that counsel has presented so vigorously on behalf of the various members of the Patel family, but we find that none of them suffices to show that the Board abused its discretion in these matters. We therefore DENY all three petitions for review.

A true Copy:

  Teste:


       _____
       *Clerk of the United States Court of*
       *Appeals for the Seventh Circuit*