In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-3966 & 07-2252

ABDUL H. KHAN, YASMEEN HASEEB,
SARAH HASEEB, and SANA HASEEB,

*Petitioners,*

*v.*

MARK FILIP, Acting Attorney General
of the United States,

*Respondent.*

Petitions for Review of Orders of
the Board of Immigration Appeals.
Nos. A96-494-318, A96-494-319, A96-494-320 & A96-494-321

ARGUED JANUARY 18, 2008—DECIDED JANUARY 29, 2009

Before BAUER and SYKES, *Circuit Judges.**

SYKES, *Circuit Judge.* Abdul Khan is a native and citizen of Pakistan who entered the United States with his

---

* Circuit Judge Ann Claire Williams recused herself after oral argument and has not participated in deciding this appeal. This decision is being issued by a quorum of the panel. *See* 28 U.S.C. § 46(d).

family in 1998. They remained here after their visitors' visas expired, and in 2003 Khan applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). His family members are derivative applicants. An Immigration Judge ("IJ") heard the claims and denied relief, concluding that Khan's asylum application was untimely and the delay was not excused by extraordinary circumstances; that Khan failed to show he had suffered politically motivated persecution in Pakistan; and that Khan had failed to show a clear probability that he would be persecuted or tortured if he returned to Pakistan.

The Board of Immigration Appeals ("BIA") affirmed. Khan then moved to reopen, presenting what he characterized as new evidence about his physical and mental condition that he claimed undermined the IJ's decisions. The BIA declined to reopen the case. Khan asks us to review each of these decisions.

We dismiss in part and deny in part the petitions for review. Under 8 U.S.C. § 1158(a)(3), we lack jurisdiction to review the BIA's determinations that Khan's asylum claim was untimely and the delay was not excused by extraordinary circumstances. The REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a)(1)(ii), 119 Stat. 231, 310-11, permits judicial review of constitutional claims or questions of law; Khan's challenges to the immigration agency's timeliness and "extraordinary circumstances" determinations address only factual and discretionary issues and therefore lie outside our review jurisdiction. *See Vasile v. Gonzales*, 417 F.3d 766 (7th Cir. 2005). We

also conclude that substantial evidence supports the agency's denial of withholding of removal and protection against removal under the CAT. Finally, to the extent we have jurisdiction to review the denial of Khan's motion to reopen, we conclude that the BIA did not abuse its discretion in determining that Khan's "new evidence" was neither new nor material.

## I. Background

Khan is a Mohajir, a term used to describe Pakistanis of Indian descent. Because Mohajirs faced difficulties competing with other Pakistanis for jobs and political influence, some Mohajirs joined the Mohajir Quami Movement ("MQM"), an organization ostensibly devoted to expanding the influence of its members. Khan joined the MQM in 1985 and assumed an active role in the organization; he assisted the party by distributing flyers, making speeches, transporting voters to polls, raising funds, and displaying political signs.

Beginning in the early 1990s, some elements of the MQM began turning to violence as a means of achieving the organization's goals. Khan's brother, a former MQM member, was beaten by the organization when he refused to follow MQM orders to kidnap a political opponent; he later fled to England. The MQM's violent turn and the mistreatment of his brother prompted Khan to resign from the organization; he told MQM members he needed to care for his ill father. Nevertheless, Khan continued to provide monthly financial support to the MQM.

Khan first came to the United States in June 1995 after
the Pakistani government falsely arrested him and de-
tained him for nearly two days.[1] Khan returned to Pakistan
17 days later when he learned his father had suffered a
heart attack. Upon his return, MQM members began
harassing him. For example, when Khan explained that
he needed to care for his ailing father, an MQM member
threatened to kill Khan's father. Later, in December 1997,
Khan and his family were carjacked by men Khan said
he recognized as MQM members. Khan was warned not
to report the crime to the police, but he did so anyway.

The cumulative impact of these events prompted Khan
to make arrangements to leave Pakistan. He quit his job
in December 1997 and came to the United States by him-
self in February 1998 to prepare for his family's reloca-
tion. However, Khan returned to Pakistan in March 1998
because his youngest daughter was ill. Back in Pakistan,
Khan asked police about the progress of the investiga-
tion into his stolen car. He believes MQM members saw
him go to the police, and in May Khan was abducted by

---

[1] The Pakistani government had begun cracking down on
MQM violence and mistakenly arrested Khan, thinking he
was his brother (though there is no evidence his brother was
implicated in MQM violence). Khan was beaten and kicked
during his two-day detention, and was released only after his
family paid a bribe. Khan's present claims, however, are not
premised on this incident; he does not argue that the Pakistani
government will subject him to persecution if he is removed
to his native country. His claims for relief from removal are
instead based on the abuse he fears from the MQM.

the MQM and held for nearly three days. During his detention, his captors accused him of reporting their activities to the police, severely beat him and threatened to kill him, and warned him never to speak to the police again. For emphasis, they showed him a box containing severed fingers. Khan's family notified authorities about his abduction, but Khan never filed a complaint about the kidnapping with the police or reported it to the medical personnel who treated his injuries after his release.

This incident finally convinced Khan to move his family to the United States. Khan entered this country in June 1998 with his wife and two daughters, and they overstayed their visitors' visas. Khan had little trouble obtaining numerous jobs, renting an apartment, and supporting his family. But Khan's friends noticed that his experiences in Pakistan caused him to develop symptoms of depression, avoid social contact, and have difficulty making decisions.

One of Khan's friends urged him to apply for asylum based on his mistreatment by the MQM, but Khan waited several years to pursue that option. In June 2002 the Attorney General announced the National Security Entry-Exit Registration System, which required aliens from certain countries (including Pakistan) to register with immigration officials. *See* Registration and Monitoring of Certain Non-Immigrants, 67 Fed. Reg. 52,584-601 (Aug. 12, 2002). This development prompted Khan to apply for asylum, and in March 2003 (several months before he was required to register and nearly five years

after arriving in the United States) he submitted an application for asylum, withholding of removal, and protection against removal under the CAT.

In May 2005 an IJ denied all of Khan's applications. The asylum claim had been filed well beyond the one-year time limit established by 8 U.S.C. § 1158(a)(2)(B), and the IJ rejected it as untimely. Khan asserted that he did not know about the one-year deadline and that his poor mental health—his depression and fear of being returned to Pakistan—compromised his ability to timely file for asylum. He argued that these were the sort of "extraordinary circumstances" that should excuse the late filing under 8 U.S.C. § 1158(a)(2)(D), but the IJ disagreed. Turning to Khan's withholding-of-removal claim, the IJ questioned the credibility of certain aspects of Khan's testimony but nonetheless accepted it; the IJ held that the attacks were not sufficiently severe to be considered persecution and were not motivated by Khan's political beliefs. The IJ also rejected Khan's claim of an objectively reasonable fear of future persecution. Finally, the IJ concluded that Khan had not shown it was more likely than not that he would be tortured if he were removed to Pakistan. Accordingly, the IJ entered an order of removal. The BIA adopted and affirmed the IJ's decision, and Khan filed a petition for review.

While Khan's petition for review was still in the briefing stage, he asked the BIA to reopen his removal proceeding based on what he claimed was new evidence—affidavits with additional mental health reports—supporting his allegation that his mental anguish

should excuse his untimely asylum application. Khan also argued that the reports addressed the IJ's skepticism about the credibility of certain aspects of his testimony. The BIA denied the motion to reopen, holding that the "new evidence" was merely repetitious and did not provide a basis for upsetting the IJ's determinations. The BIA noted that the IJ had accepted Khan's testimony about the assaults and the medical reports did not undermine the IJ's alternative conclusion that the attacks were not motivated by political opinion. Khan filed a petition for review of this decision as well, and we ordered the petitions consolidated.

## II. Discussion

### A. Asylum claim

Khan first challenges the immigration agency's failure to reach the merits of his asylum claim. The IJ dismissed Khan's asylum application because it was not filed within a year after Khan arrived in the United States as required by 8 U.S.C. § 1158(a)(2)(B). The IJ had the discretion to ignore this deadline if Khan established that his delay was due to "extraordinary circumstances," *id.* § 1158(a)(2)(D), but the IJ did not think Khan presented sufficiently compelling circumstances to excuse his nearly five-year delay. The BIA affirmed. Khan challenges the agency's determination that he lacked "extraordinary circumstances" for the untimely filing, arguing that the IJ did not give appropriate weight to the evidence

showing Khan suffered from a serious mental disability because of his mistreatment while in Pakistan.

The problem for Khan is that we lack jurisdiction to review the IJ's timeliness determination. Under 8 U.S.C. § 1158(a)(3), we have no jurisdiction to review any decision the agency makes under § 1158(a)(2), including decisions relating to whether the applicant has demonstrated "extraordinary circumstances" excusing a delay in filing an asylum application. The REAL ID Act of 2005 preserved our jurisdiction to review "constitutional claims" or "questions of law." *See* 8 U.S.C. § 1252(a)(2)(D). But as we explained in *Vasile v. Gonzales*, 417 F.3d 766, factual determinations (such as whether the asylum application was filed within the one-year deadline) and discretionary decisions (such as whether the alien has demonstrated "extraordinary circumstances" justifying the delay) do not fall within the exception to the jurisdictional bar for constitutional claims or questions of law under § 1252(a)(2)(D). *See id.* at 768-79.

Khan urges us to reconsider our holding in *Vasile.* He argues that *Vasile*, which discussed the question-of-law exception created by the REAL ID Act, gave insufficient attention to the legislative history of the Act. A closer look at that legislative history, Khan claims, demonstrates that Congress intended the term "questions of law" to encompass not only questions of statutory interpretation but also questions concerning the application of law to a set of facts—or mixed questions of law and fact.

We decline Khan's invitation to revisit *Vasile*. Section 1158(a)(2)(D) provides: "An application for asylum of an

alien *may* be considered . . . if the alien demonstrates *to the satisfaction* of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within [the one-year period]." (Emphasis added.) The terms "may" and "to the satisfaction of" strongly indicate that decisions under § 1158(a)(2)(D) are, as we said in *Vasile*, "inherently discretionary" and not reviewable. 417 F.3d at 768. Every circuit to consider this issue save one has agreed with our interpretation.[2]

---

[2]  *See, e.g.*, *Zhu v. Gonzales*, 493 F.3d 588, 596 n.31 (5th Cir. 2007) (noting that federal appellate courts lack jurisdiction "to review timeliness determinations that are based on an assessment of the facts and circumstances of a particular case"); *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 332 (2d Cir. 2006) ("This petitioner's challenge is merely an objection to the IJ's factual findings and the balancing of factors in which discretion was exercised."); *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir. 2006) (holding that a petitioner's argument that a pending adjustment-of-status application excused his untimely asylum application "is a challenge to an exercise of discretion that remains outside our scope of review"); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (amending *Castellano-Chacon v. INS*, 341 F.3d 533 (6th Cir. 2003), a case cited in *Vasile*, to clarify that courts lack jurisdiction to review "asylum applications denied for untimeliness only when the appeal seeks review of discretionary or factual questions" and declining to exercise jurisdiction over a claim that the IJ incorrectly applied the "changed circumstances" provision);
(continued...)

Far from supporting Khan's interpretation, the legislative history accompanying the REAL ID Act confirms our reading of the statute. *See* H. REP. 109-72, at 174-76 (2005). The House Conference Report discussing the REAL ID Act describes what the term "questions of law" meant in the statutory provision that would become § 1252(a)(2)(D). The report indicates that although Congress had considered adding the word "pure" before "questions of law," the modifier was left out because it was understood that "a 'question of law' is a question regarding the construction of a statute" and therefore "[t]he word 'pure' adds no meaning." H. REP. 109-72, at

---

(...continued)

*Sukwanputra v. Gonzales*, 434 F.3d 627, 635 (3d Cir. 2006) (finding that a claim that the petitioners showed changed circumstances or extraordinary circumstances was discretionary); *Ignatova v. Gonzales*, 430 F.3d 1209, 1214 (8th Cir. 2005) (finding that the presence of changed circumstances "is a discretionary judgment of the Attorney General"); *Chacon-Botero v. U.S. Att'y Gen.*, 427 F.3d 954, 957 (11th Cir. 2005) ("The timeliness of an asylum application is not a constitutional claim or question of law covered by the Real ID Act's changes.").

As far as we can tell, only the Ninth Circuit has concluded that the inquiry contemplated by § 1158(a)(2)(D) is not a discretionary one. *See Ramadan v. Gonzales*, 479 F.3d 646, 656 (9th Cir. 2007). However, we are not persuaded by its reasoning. As we just noted, seven other circuits agree with our interpretation, and the Ninth Circuit's refusal to rehear *Ramadan* en banc prompted a strongly worded dissent from nine judges, *see Ramadan v. Keisler*, 504 F.3d 973 (9th Cir. 2007) (O'Scannlain, J., dissenting from denial of rehearing en banc).

175. The report also explains that this provision was designed "to permit judicial review over those issues that were historically reviewable on habeas—constitutional and statutory-construction questions, not discretionary or factual questions." *Id.*

Khan suggests nonetheless that Congress was trying to incorporate more than constitutional and statutory-interpretation questions into the phrase "questions of law." Accepting that Congress wanted to maintain judicial review of claims "historically reviewable on habeas," Khan seizes upon language from *INS v. St. Cyr*, 533 U.S. 289 (2001), stating that habeas relief was traditionally available for "detentions based on errors of law, including the erroneous *application* or interpretation of statutes." *Id.* at 302 (emphasis added). The legislative history does suggest that Congress drew on *St. Cyr* when adopting the provision that would become § 1252(a)(2)(D), but not for the point Khan makes. The conference report indicates Congress sought to address the Supreme Court's concern in *St. Cyr* that the elimination of judicial review over legal issues would raise serious constitutional problems; there is nothing to suggest, however, that the phrase "questions of law" as that term is used in § 1252(a)(2)(D) includes mixed questions of law and fact. To the contrary, the conference report mentions so-called mixed questions of law and fact as follows: "When a court is presented with a mixed question of law and fact, the court should analyze it to the extent there are legal elements, but should not review any factual elements." H. REP. 109-72, at 175.

We acknowledge that the line between legal questions—which we can review—and discretionary or factual determinations—which we cannot—is occasionally difficult to draw. In many cases, such as this one, we can determine our lack of jurisdiction fairly readily because it is clear we are being asked to review either factual determinations or the manner in which the agency weighed the various factors that inform the exercise of its discretion. *See, e.g., Ogayonne v. Mukasey*, 530 F.3d 514, 519 (7th Cir. 2008); *accord Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 332 (2d Cir. 2006). Some discretionary determinations do present underlying, reviewable questions of law, such as those in which the agency is alleged to have applied the wrong legal standard. *See Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007) (recognizing that we retain jurisdiction to determine whether the IJ erred in requiring "exceptional circumstances" instead of "extraordinary circumstances"). But the jurisdictional bar cannot be overcome by trying to "shoehorn" a factual or discretionary determination "into the 'question of law' category" or claiming that a question of law exists simply because the agency failed to "apply the law," as Khan does here.[3] *Vasile,* 417 F.3d at 768; *see also Chen*, 471

---

[3] Khan identifies what he thinks are purely legal errors stemming from erroneous interpretations of 8 C.F.R. § 1208.4(a)(5). This regulation addresses situations in which an IJ may excuse the failure to file a timely asylum application based on "extraordinary circumstances." Khan argues that the IJ required him to provide more evidence excusing his delay than is
(continued...)

F.3d at 329-30 ("[W]hen analysis of the arguments raised by the petition for judicial review reveals that they do not in fact raise any reviewable issues, the petitioner cannot overcome this deficiency and secure review by using the rhetoric of a 'constitutional claim' or 'question of law' to disguise what is essentially a quarrel about fact-finding or the exercise of discretion.").

Because Khan presents a challenge that "is merely an objection to the IJ's factual findings and the balancing of factors in which discretion was exercised," we lack jurisdiction to review it.[4] *Chen*, 471 F.3d at 332 (dismissing

---

[3] (...continued)
called for by the regulations. This is an argument about the sufficiency of the evidence, not the interpretation of the regulation.

[4] Anticipating this result, Khan argues that our holding creates serious constitutional problems. The REAL ID Act replaced the system of challenging deportation orders via habeas approved in *INS v. St. Cyr*, 533 U.S. 289, with a system that permits federal appellate courts to review constitutional claims and questions of law on petitions for review from the immigration agency. *See* H. REP. 109-72, at 175. Drawing again on language from *St. Cyr*, Khan argues that the traditional scope of habeas allowed challenges to "detentions based on errors of law, including the erroneous *application* or interpretation of statutes." *St. Cyr.*, 533 U.S. at 302 (emphasis added). This statement was part of a broader commentary by the Court that the only method through which an alien could challenge a deportation order until the 1950s was a habeas petition. Khan

(continued...)

for lack of jurisdiction a similar challenge to an untimeliness determination). Khan's claim that his mental anguish constituted an "extraordinary circumstance" preventing him from filing a timely asylum application raises no legal issue; it is, instead, a quintessentially factual and discretionary issue.[5] *See, e.g.*, *Ogayonne*, 530

---

[4] (...continued)
argues that if we lack jurisdiction to review mixed questions of law and fact, § 1252(a)(2)(D) is not an adequate substitute for habeas.

We think Khan mischaracterizes this aspect of *St. Cyr*. The Court expressed concern that any action by Congress that would "entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions," *id.* at 300; the Court did not suggest that the inability to review mixed questions of law and fact would raise constitutional concerns. The concern about judicial review of purely legal questions has been alleviated by § 1252(a)(2)(D), which authorizes review of constitutional claims and questions of law.

[5] Khan thinks this case falls into an exception recognized by some of our sister circuits to permit review of the agency's application of law to facts if the facts are undisputed. *See Liu v. INS*, 508 F.3d 716, 722 (2d Cir. 2007) (recognizing the possibility of exercising jurisdiction over discretionary decisions based on "unambiguous mischaracterizations" of the record, such as when an IJ states that his decision is based on a lack of testimony on a topic yet the record unambiguously reveals the existence of such testimony); *cf. Ramadan v. Gonzales*, 479 F.3d 646, 657 (9th Cir. 2007) (noting that the factual basis of the petition was undisputed and proceeding to determine whether

(continued...)

F.3d at 519; *Zeqiri v. Mukasey*, 529 F.3d 364, 369 (7th Cir. 2008); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1086-87 (7th Cir. 2006); *Sokolov v. Gonzales*, 442 F.3d 566, 568-69 (7th Cir. 2006); *Vasile,* 417 F.3d at 768-69.

### B. Withholding-of-removal and CAT claims

There is no jurisdictional bar preventing us from reviewing the IJ's decision to reject Khan's withholding-of-removal and CAT claims. Where the BIA affirms and adopts the decision of the IJ, as it did in this case, we review the IJ's decision as supplemented by the BIA. *BinRashed v. Gonzales*, 502 F.3d 666, 670 (7th Cir. 2007). Our examination of the agency's decision is limited to determining whether its conclusion is supported by substantial evidence. *Sankoh v. Mukasey*, 539 F.3d 456, 468 (7th Cir. 2008). Under this extremely deferential standard, we will uphold the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *BinRashed*, 502 F.3d at 670

---

[5]  (...continued)

the facts constitute "changed circumstances"). We take no position on this exception; this is not a case of undisputed facts. Khan offered multiple factual bases for excusing his late application ranging from his purported ignorance of the statutory deadline to the difficulties posed by his mental problems. The IJ had to evaluate the evidence and testimony and make factual findings (such as determining whether Khan was in fact ignorant of the deadline and determining the severity of Khan's mental problems).

(internal quotation marks omitted). Reversal is warranted only if "the evidence *compels* a different result," and we will not overturn the agency's findings just because we might have reached a different conclusion. *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004).

An alien is entitled to withholding of removal under the INA if he can show a "clear probability" that his "life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Aung v. Gonzales*, 495 F.3d 742, 746 (7th Cir. 2007). Similarly, an alien is entitled to protection against removal under the CAT if he can show it is "more likely than not" that he will be tortured if removed. *Aung*, 495 F.3d at 747. Although these standards are the same, both impose a more stringent test than the "well-founded fear" standard employed in asylum cases. *See Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005).

There are two ways that an alien can show he is entitled to withholding of removal. First, he can show that he was subject to past persecution, which triggers a rebuttable presumption of future persecution. *See* 8 C.F.R. § 1208.16(b)(1); *Irasoc v. Mukasey*, 522 F.3d 727, 729-30 (7th Cir. 2008). Second, in the absence of any evidence of past persecution, an alien can show that it is more likely than not that he will suffer future persecution if removed. *See* 8 C.F.R. § 1208.16(b)(2); *BinRashed*, 502 F.3d at 671. We have said that persecution entails "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as

legitimate." *De Souza v. INS*, 999 F.2d 1156, 1158 (7th Cir. 1993). And while persecution can be established from a single particularly vicious incident, *see Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003), not every example of mistreatment rises to the level of persecution, *see Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005) ("An asylum applicant need not show that her life or freedom were threatened, but the harm she suffered must rise above the level of 'mere harassment' and must result from more than unpleasant or even dangerous conditions in her home country.").

The IJ rejected Khan's past-persecution arguments, concluding that the attacks Khan suffered at the hands of the MQM did not amount to persecution and that Khan failed to establish that his attackers were motivated by his political beliefs. Whether substantial evidence supports the first conclusion is a close question, but we need not address it; the record does not compel a contrary result as to the second conclusion, and the agency's rejection of Khan's claim of past persecution can be sustained on this basis alone. To be considered persecution, an alien's mistreatment must be "because of the alien's . . . political opinion." 8 U.S.C. § 1231(b)(3)(A). Khan testified that he quit the MQM and stopped contributing money to the organization because he disagreed with its violent tactics. He argues that the chain of events culminating in his kidnapping compels the conclusion that he was targeted because of his political beliefs.

Substantial evidence supports the IJ's opposite conclusion, however. Khan testified that the MQM extorted

money and property from Pakistanis indiscriminately, which undermines his argument that he was targeted for his opposition to MQM's violent actions. The record suggests that the MQM was motivated more by financial gain rather than political philosophy. The MQM demanded payment from every person in Khan's neighborhood, including those who had never joined the organization, and MQM members began assaulting Khan only after he stopped his payments and approached the police—not when he left the organization.[6] Furthermore, the apparent goal of Khan's kidnapping was to deter him from contacting the police regarding the carjacking. The evidence indicates that the MQM wanted to avoid criminal prosecution of its members for their carjacking and kidnapping activities—a conclusion confirmed by Khan's testimony that police had launched an effort to crack down on the organization's violent actions—rather than to punish Khan for his political opinion. *See, e.g., Doe v. Gonzales*, 484 F.3d 445, 447-48 (7th Cir. 2007) (homicides motivated solely by a desire to eliminate witnesses to a crime were not on account of protected ground).

Despite his failure to establish past persecution, Khan can still demonstrate he is entitled to withholding of removal if he shows that it is more likely than not that he

---

[6] In an unpublished order, we previously refused to find political persecution when the MQM extorted money from all neighboring businesses. *See Rehman v. Keisler*, 252 F. App'x 752, 754 (7th Cir. 2007) ("[A]n alien's refusal to cooperate with a political party does not, without more, compel a conclusion of political persecution.").

would suffer persecution upon his return to Pakistan. However, the IJ rejected Khan's arguments, and the record does not compel a contrary conclusion. Khan claims he fears returning to Pakistan because the MQM has a policy of attacking those who inform police about its activities. Yet Khan has not lived in Pakistan since 1998, and it is hard to see how the MQM could think he has any information of value to provide the police at this point. We doubt that police are still investigating a carjacking that is more than a decade old—or more importantly, that the MQM still remembers Khan's decision to report it. We also note that despite the numerous threats Khan claims the MQM has made against him, MQM members have never harmed any of Khan's extended family still remaining in Pakistan. In any event, because Khan fears MQM retaliation based on his decision to report a carjacking and not because of his political opinion, his fear of persecution is not based on a protected ground entitling Khan to withholding from removal.

Finally, Khan challenges the IJ's conclusion that he is not entitled to protection against removal under the CAT. "Torture," as the term is used by the CAT, includes "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Although Khan's arguments focus on showing that he will likely suffer "persecution" and ignore whether he is likely to suffer "torture," a petitioner's failure to show a clear probability of future persecution also means he cannot

show a likelihood that he will be tortured. *See, e.g.*, *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995) (citing torture as an example of persecution).

### C. Motion to reopen

Khan's final argument is that the BIA erroneously denied his motion to reopen his removal proceeding. The BIA has discretion to reopen a removal proceeding when an alien presents new evidence that "is material and was not available and could not have been dis-covered or presented at the former hearing." 8 C.F.R. § 1003.2(a), (c)(1). In his motion to reopen, Khan provided affidavits from two individuals who treated him at a clinic devoted to helping people in Khan's position— although Khan did not seek this treatment until 2006, well after his removal hearing concluded. These affidavits describe the physical evidence of and symptoms associated with Khan's kidnapping and diagnose his mental illnesses. This, in Khan's view, constituted new evidence on the issue of whether his mental illness pre-vented him from filing a timely asylum application and whether the MQM persecuted him. The BIA disagreed.

We pause to note that we have limited jurisdiction to review this claim. *See Pilch v. Ashcroft*, 353 F.3d 585, 586-87 (7th Cir. 2003) (holding that no jurisdiction exists to consider a denial of a motion to reopen based on dis-cretionary determinations); *accord Durant v. INS*, 393 F.3d 113, 115 (2d Cir. 2004) (orders of removal and denials of motions to reopen "are sufficiently connected" that permitting review of the latter when the INA bars review

of the former "would provide an improper backdoor method of challenging a removal order"); *Rodriguez v. Ashcroft*, 253 F.3d 797, 800 (5th Cir. 2001) ("It is axiomatic that if we are divested of jurisdiction to review an original determination by the Board . . . , we must also be divested of jurisdiction to review the Board's denial of a motion to reopen on the [same grounds]."). In this context, our review is limited to determining whether the BIA offered a sufficient reason for declining to reopen Khan's case. *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007).

The BIA may decline to reopen a removal proceeding if it concludes the petitioner failed to provide previously unavailable, material evidence, and we review the BIA's refusal to reopen on these grounds for an abuse of discretion. *INS v. Doherty*, 502 U.S. 314, 323 (1992); *Kebe*, 473 F.3d at 857. We will uphold the BIA's decision "'unless it was made without rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination.'" *Pavlyk*, 469 F.3d at 1091 (quoting *Boykov v. Ashcroft*, 383 F.3d 526, 530 (7th Cir. 2004)). The Supreme Court has said that motions to reopen are disfavored, and thus Khan faces a heavy uphill battle to convince us that the BIA erred. *Doherty*, 502 U.S. at 323.

We are convinced the BIA did not abuse its discretion. First, Khan did not go to the treatment center until after his original removal hearing, strongly suggesting that he did not pursue his claims with the requisite diligence. *See* 8 C.F.R. § 1003.2(c)(1) (stating that new information

should be incapable of having been "discovered or presented at the former hearing"). Second, the "new evidence" was not material. Although the IJ concluded the attacks Khan suffered were not sufficiently severe to constitute persecution, he also concluded that Khan had not established that the attacks were politically motivated or that Khan was likely to suffer politically motivated persecution if returned to Pakistan. The affidavits submitted with the motion to reopen do not address these latter conclusions and therefore do not undermine the IJ's ultimate decision to deny relief. Similarly, the IJ's conclusion that Khan's asylum application was untimely was based on his determination that Khan had not established that his emotional and psychological problems justified the four-year delay in filing the application. The affidavits discussing Khan's mental state do not address whether it would have been unreasonable to expect him to file a timely asylum application in light of that mental state. Finally, the "new evidence" was not new. The affidavits reported that Khan suffered from symptoms associated with depression, anxiety, and frustration, but also noted that he was able to obtain and maintain employment, care for his children, and focus on his future; the IJ considered similar information at Khan's removal hearing.

For the foregoing reasons, the petitions for review are DISMISSED in part for lack of jurisdiction and DENIED in part.