In the

# United States Court of Appeals
## for the Seventh Circuit
_____

No. 21-2844

GAYRATJON GOLIBJONIVICH GULOMJONOV,

*Petitioner*,

*v.*

PAMELA J. BONDI,
Attorney General of the United States,*

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A215-809-685

_____

ARGUED JANUARY 12, 2023 — DECIDED MARCH 14, 2025

_____

Before SYKES, *Chief Judge*, and EASTERBROOK and RIPPLE, *Circuit Judges*.

SYKES, *Chief Judge*. Gayratjon Gulomjonov, a native and citizen of Uzbekistan, came to the United States as a visitor in October 2016 and obtained a student visa extending his

---

* Pamela J. Bondi replaced Merrick B. Garland as Attorney General and is substituted as the respondent. *See* FED. R. APP. P. 43(c)(2).

stay to January 2019. He overstayed that authorization and in November 2019 was placed in removal proceedings. Conceding removability, he requested asylum, withholding of removal, or protection under the Convention Against Torture based on his conversion to Catholicism during his stay in this country. He claimed that he would suffer religious persecution if returned to Uzbekistan, a predominantly Muslim country.

Asylum applications must be filed within one year of arrival in the United States, *see* 8 U.S.C. § 1158(a)(2)(B), so Gulomjonov's claim was untimely by more than two years. He invoked the exception for changed circumstances, *id.* § 1158(a)(2)(D), but a regulation requires applicants to file within a reasonable time of the change in circumstances, 8 C.F.R. § 1208.4(a)(4)(ii). Based on Gulomjonov's testimony about the timing of his religious conversion, an immigration judge found that his change in circumstances occurred no later than April 2019. But he did not seek asylum until ten months later; the judge found that he did not apply within a reasonable time and denied the claim as untimely. The remaining claims were denied on the merits. The Board of Immigration Appeals upheld the decision across the board, and Gulomjonov petitioned for our review.

He raises two challenges to the denial of his asylum claim on untimeliness grounds: (1) the "reasonable time" regulation is invalid; and (2) even if the regulation is valid, the immigration judge was mistaken about the date of his religious conversion. He also argues that the agency misconstrued the evidence about the treatment of Christians in Uzbekistan in denying his other claims.

We dismiss the petition in part and deny it in part. Our jurisdiction to review the agency's untimeliness ruling is limited to constitutional claims or questions of law. *See* 8 U.S.C. §§ 1158(a)(3), 1252(a)(2)(D). Gulomjonov's challenge to the validity of the regulation is a question of law, but it fails on the merits; his backup argument about the date of his change in circumstances is an unreviewable factual claim. His challenge to the denial of his remaining claims is perfunctory and insufficient to disturb the agency's decision.

## I. Background

Gulomjonov was born in Uzbekistan, a predominantly Muslim country, and grew up in a Muslim family. He came to the United States in October 2016 at the age of 18 as a nonimmigrant visitor. In April 2017 he obtained an F-1 student visa authorizing him to remain here for educational purposes until January 2019.

According to Gulomjonov's asylum application and testimony at his removal hearing, he became interested in Catholicism soon after arriving in this country. Within weeks of his arrival, a family friend took him to church. In May 2017 he visited Daler Khamidov, another close family friend from Uzbekistan; while riding in Khamidov's car, he noticed a Bible and asked his friend about it. Khamidov explained that he had converted to Catholicism, but he asked Gulomjonov not to tell anyone. Still, Khamidov answered Gulomjonov's questions about the religion, and their conversation fueled Gulomjonov's interest in learning more about the Catholic faith.

By late 2018, Gulomjonov's interest in Catholicism had intensified. Following his arrest in early November for an

altercation with two women, he turned to Catholicism for solace and mercy.[1] At that point he decided to become a Catholic, and under Khamidov's guidance, he began reading the Bible and books about the faith. By early March 2019 he was regularly attending church. According to his application and testimony, his belief was strong by this time and he considered himself a Catholic, but he was afraid to tell his father and had not yet told his roommates and coworkers, who were Uzbeki Muslims.

At a work meeting in April 2019, Gulomjonov's boss asked him why his availability for weekend work had changed. Gulomjonov explained that he had converted to Catholicism. Around the same time, he also told his coworkers and roommates that he had become a Catholic. But he asked them not to tell his father.

Gulomjonov's student visa expired three months earlier, in January 2019. On November 24, 2019, he was detained by immigration authorities.[2] While in detention he spoke with a priest, who encouraged him to tell his family about his conversion. In December 2019 Gulomjonov told his father that he had converted to Catholicism.

---

[1] The details of Gulomjonov's arrest and criminal history—and their effect, if any, on his eligibility for immigration benefits—are not relevant to the issues presented here.

[2] According to the record, Gulomjonov was married to a United States citizen on November 18, 2019, a few days before he was detained. His relationship with his wife apparently became strained after his detention. The status of his marriage is unclear, but it has no bearing on the issues raised here.

Removal proceedings followed. In February 2020 Gulomjonov conceded removability and applied for asylum, withholding of removal, or relief under the Convention Against Torture ("CAT"). He argued that he would be persecuted in Uzbekistan because of his conversion to Catholicism.[3]

An immigration judge held a removal hearing and denied all three requests for relief. The judge first held that Gulomjonov's asylum application was untimely because he had not filed it within one year of his arrival in the United States in October 2016, as required by § 1158(a)(2)(B). To overcome the time bar, Gulomjonov invoked the changed-circumstances exception, which provides that an asylum application "may be considered" notwithstanding noncompliance with the one-year filing deadline "if the alien demonstrates to the satisfaction of the Attorney General … the existence of changed circumstances which materially affect the applicant's eligibility for asylum." § 1158(a)(2)(D). Gulomjonov argued that his religious conversion was a material change in circumstances.

The judge assumed that Gulomjonov's conversion qualified as a material change but found that it did not excuse the untimeliness of his application. A regulation provides that to take advantage of the exception, asylum seekers must apply "within a reasonable period given th[e] 'changed circumstances.'" 8 C.F.R. § 1208.4(a)(4)(ii). Based on Gulomjonov's

_____

[3] As far as we can tell from the record, Gulomjonov was not baptized or otherwise formally received into the Catholic Church. But the immigration agency credited the sincerity of his conversion, and we have no reason to question that determination.

asylum application and testimony at his removal hearing, the judge determined that his conversion occurred no later than April 2019. By that time, the judge reasoned, he was attending church, reading the Bible, and considered himself a Catholic; he had also told his boss, coworkers, and room-mates of his conversion to Catholicism. Because he did not apply for asylum until February 2020—ten months later—the judge determined that he had not applied within a reasonable time and denied the application as untimely.

Gulomjonov argued that the judge should use a later date to start the "reasonable time" clock: December 2019, when he told his father about his conversion to Catholicism. Measured from that date, his delay in filing was three rather than ten months. The judge rejected his proposed alternative date, noting that Gulomjonov's decision to inform his father about his conversion did not materially affect his eligibility for asylum. As the judge viewed the record, the relevant point of reference for the changed-circumstances exception was the conversion itself—the basis for his asylum claim. According to Gulomjonov's own testimony, he considered himself a Catholic by April 2019, long before he told his father.

The immigration judge turned next to Gulomjonov's claim for withholding of removal. The removal statute provides, in relevant part, that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's … religion." 8 U.S.C. § 1231(b)(3)(A). A showing of past persecution permits an immigration judge to apply a presumption of future perse-cution for purposes of evaluating a withholding claim.

8 C.F.R. § 1208.16(b)(1). But Gulomjonov had not suffered persecution in his home country, so he needed to establish that "his … life or freedom would be threatened in the future," which in turn required him to establish that "it is more likely than not that he … would be persecuted on account of … religion" if he returned to Uzbekistan. *Id.* § 1208.16(b)(2). He could satisfy this burden by showing that the government in Uzbekistan would single him out for persecution, or alternatively, that the government engaged in a pattern or practice of persecuting similarly situated persons. *Id.*

Gulomjonov did not claim that he would be singled out for persecution. In an effort to prove a pattern or practice of government-sponsored mistreatment of Catholics, he submitted several governmental and nongovernmental reports noting that although the Catholic Church is not illegal in Uzbekistan, the government surveilled some church services, arrested proselytizers, banned a Catholic youth camp, and generally harassed Christians.

The immigration judge acknowledged this evidence but found it insufficient to show the degree and persistence of mistreatment necessary to prove a pattern or practice of persecution. The judge accordingly denied the request for withholding of removal. And because the requirements for relief under the torture convention are more stringent than for withholding of removal, *see id.* § 1208.16(c)(2), the judge denied the CAT claim as well and entered a removal order.

The Board of Immigration Appeals upheld the immigration judge's decision in all respects. The Board agreed that Gulomjonov's asylum application was untimely because he did not file it within a reasonable time of his religious con-

version. Gulomjonov argued that the immigration judge had picked the wrong date from which to start the reasonable-time clock. Like the immigration judge, however, the Board concluded that the relevant change in circumstances was Gulomjonov's religious conversion, which occurred no later than April 2019; the date on which Gulomjonov told his father about his conversion had no bearing on his asylum eligibility.

In a new claim, Gulomjonov argued before the Board that certain "extraordinary circumstances" excused his failure to apply for asylum within one year of his arrival. The "extraordinary circumstances" exception to the one-year filing deadline appears alongside the changed-circumstances exception but is distinct. *See* § 1158(a)(2)(D) (providing that a late asylum application "may be considered … if the alien demonstrates to the satisfaction of the Attorney General … extraordinary circumstances relating to the delay in filing"). Gulomjonov pointed to the following circumstances that he characterized as "extraordinary": (1) his age; (2) his successful maintenance of student status until January of 2019; and (3) his arrest and detention, which led to difficulties with his wife and access to counsel. Because he had not raised this argument before the immigration judge, however, the Board deemed it waived—and in any event, insufficient to excuse his delayed filing.

The Board also upheld the immigration judge's decision denying Gulomjonov's withholding claim on the merits. Accepting and elaborating on the judge's analysis, the Board explained that Gulomjonov had not satisfied his burden for withholding of removal because the country-report evidence did not show a pattern or practice of severe and systematic

government-sponsored mistreatment of Catholics in Uzbeki-
stan.

Finally, the Board noted that Gulomjonov had not mean-
ingfully challenged the denial of his CAT claim. Instead, he
simply asserted that returning him to Uzbekistan would
violate the treaty obligations of the United States. The Board
deemed the issue waived and dismissed the appeal.

## II. Discussion

Gulomjonov raises several arguments in his petition for
review; we group them into two baskets for ease of decision.
In the first basket are his challenges to the agency's ruling
regarding the untimeliness of his asylum application under
the "changed circumstances" exception to the one-year filing
deadline. *See* § 1158(a)(2)(B), (D). These include both legal
and factual arguments—a distinction with implications for
our jurisdiction, as we shall see.

In the second basket are Gulomjonov's arguments con-
cerning the denial of his claims for withholding of removal
and relief under the torture convention. The immigration
judge denied both claims on the merits; the Board upheld
that decision for a combination of procedural and substan-
tive reasons.

We begin with the agency's untimeliness ruling on the
asylum claim and then take up Gulomjonov's remaining
claims.

### A. Asylum Claim

Gulomjonov's challenge to the agency's untimeliness rul-
ing includes an attack on the validity of 8 C.F.R.
§ 1208.4(a)(4)(ii), the regulation requiring late asylum seek-

ers who apply under the "changed circumstances" exception to do so "within a reasonable period given th[e] changed circumstances." Gulomjonov argues that the regulation is inconsistent with the statute and therefore invalid. Alternatively, he argues that even if the regulation is valid, the immigration judge and the Board of Immigration Appeals chose the wrong date on which to start the "reasonable time" clock.

We begin, as we must, by addressing our jurisdiction to consider these arguments. Congress has sharply limited judicial review of certain agency decisions regarding immigration benefits. As relevant here, § 1158(a)(3) bars judicial review of the immigration agency's decisions under § 1158(a)(2), which encompasses (among other things) the one-year filing deadline for asylum claims and the discretionary exceptions to it. *See* § 1158(a)(2)(B) (the provision requiring applicants to file within one year of arrival); *id.* § 1158(a)(2)(D) (the exceptions for "changed circumstances" and "extraordinary circumstances").

More specifically, § 1158(a)(3) states in unequivocal terms: "No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." The Supreme Court has explained that this provision contains "plainly jurisdictional language." *Santos-Zacaria v. Garland*, 598 U.S. 411, 419 & nn. 5–6 (2023).

Another immigration statute, however, preserves judicial review for "constitutional claims or questions of law." § 1252(a)(2)(D). The Supreme Court has held that the preservation of judicial review for questions of law includes "the application of a legal standard to undisputed or established facts." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 225 (2020).

Gulomjonov's challenge to the reasonable-time regula-
tion, § 1208.4(a)(4)(ii), is clearly a question of law. His back-
up challenge to the agency's finding about the date of his
change in circumstances is an unreviewable factual claim.

### i.   Validity of 8 C.F.R. § 1208.4(a)(4)(ii)

We turn first to Gulomjonov's challenge to the validity of
§ 1208.4(a)(4)(ii). The parties briefed this issue under the
rubric of *Chevron*, the longstanding framework for evaluat-
ing agency interpretations of statutes. *Chevron U.S.A., Inc. v.
Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In its most
basic formulation, the *Chevron* doctrine instructed courts to
defer to "permissible" agency interpretations of statutes
when the text is ambiguous or silent on the question before
the court. *Id.* at 843.

This deferential framework is no longer operative. Last
year the Supreme Court overruled *Chevron* in *Loper Bright
Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). Our new
instructions in agency cases are to interpret statutes without
deference to the agency's interpretation, using the "tradi-
tional tools of statutory construction," exercising our "inde-
pendent judgment in deciding whether an agency has acted
within its statutory authority" while paying "[c]areful
attention to the judgment of the Executive Branch," which
"help[s] inform that inquiry." *Id.* at 401, 412–13. Especially
relevant here, the Court in *Loper Bright* made a point of
emphasizing that "when a particular statute delegates
authority to an agency consistent with constitutional limits,
courts must respect the delegation, while ensuring that the
agency acts within it." *Id.* at 413.

With the new decision method in place, we can sketch Gulomjonov's challenge to the reasonable-time regulation. It is fairly straightforward. He argues that because the text of § 1158(a)(2)(D), which contains the exceptions to the one-year filing deadline, is silent about any temporal limits, the regulation imposing a "reasonable time" limitation on applications exceeds the Attorney General's authority. This statutory silence, he says, is especially telling when considered against the backdrop of the general filing deadline in § 1158(a)(2)(B), which shows that Congress knew how to impose a time limit and expressly declined to impose one for the exceptions in subsection (D).

Our reading of the statutory text and structure yields a different conclusion. By its terms, § 1158(a)(2)(D) is an explicit delegation of authority to the Attorney General to determine exceptions to the one-year filing deadline based on an alien's change in circumstances (or alternatively, "extraordinary circumstances"). The statutory delegation is broad enough to include the authority to set a time limit for filing applications.

As a preliminary matter, the statute's one-year deadline for asylum applications demonstrates a general congressional preference for prompt applications and temporal limits on eligibility. The language of the changed-circumstances exception vests the Attorney General with wide discretion to determine whether changed circumstances warrant an exception to the general one-year deadline: it provides that a late application "*may* be considered … if the alien demonstrates *to the satisfaction* of the Attorney General … the existence of changed circumstances which materially affect

the applicant's eligibility for asylum" (emphases added). § 1158(a)(2)(D).

This is a very broad delegation of discretionary authority. *See Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005) (describing § 1158(a)(2)(D) and noting that its "[p]ermissive language that refers to demonstrating something to the agency's 'satisfaction' is inherently discretionary"). The Attorney General's broad authority to determine eligibility for the exception implicitly includes the authority to promulgate a timing requirement for those seeking to benefit from the exception. After all, doing something "to the satisfaction of" a decisionmaker is ordinarily understood to include doing so in accordance with the decisionmaker's procedural rules, including timing requirements.

Gulomjonov's restrictive interpretation is inconsistent with the breadth of the statutory delegation. It's also difficult to reconcile with the general one-year filing deadline in § 1158(a)(2)(B), which, as we've noted, reflects a congressional preference for prompt applications and temporal limits on asylum claims. If, as Gulomjonov argues, the Attorney General's statutory authority to determine eligibility for the exception *excludes* the authority to impose a time limit, then an asylum seeker could wait many years after a material change in circumstances yet still have his application considered.

The reasonable-time regulation sensibly avoids this outcome and aligns with the congressional preference for prompt asylum applications while also providing an opportunity for applicants to justify their delay in relation to the relevant change in circumstances. In this way, the regulation fits comfortably within the Attorney General's broad statuto-

ry discretion to grant exceptions based on changed circumstances. The reasonable-time regulation does not exceed the Attorney General's authority under § 1158(a)(2)(D).

### ii. Timing of Gulomjonov's change in circumstances

Alternatively, Gulomjonov argues that the immigration judge and the Board mistakenly found that the material change in his circumstances—his religious conversion—occurred in April 2019. He contends that he did not fully commit to Catholicism until he told his father about his conversion, so his change in circumstance occurred in December 2019 rather than in April.

This is a factual argument, not a legal one, so it lies outside our limited jurisdiction. "We have held that the issues of changed or extraordinary circumstances are questions of fact that lie outside the realm of § 1252(a)(2)(D)." *Yang v. Holder*, 760 F.3d 660, 665 (7th Cir. 2014); *see also Khan v. Filip*, 554 F.3d 681, 687 (7th Cir. 2009) (explaining that "factual determinations (such as whether the asylum application was filed within the one-year deadline) and discretionary decisions (such as whether the alien has demonstrated 'extraordinary circumstances' justifying the delay) do not fall within the exception to the jurisdictional bar … under § 1252(a)(2)(D)").

The disagreement about the date of Gulomjonov's change in circumstances is a quintessentially factual issue. The immigration judge weighed the evidence regarding the chronology of his religious conversion and determined that his change in circumstances occurred no later than April 2019. By that time—according to his own account—he was regularly attending church, reading the Bible, and consid-

ered himself a Catholic; and that month he also disclosed his conversion to his boss, coworkers, and roommates. Gulomjonov has not explained how the judge's distillation and assessment of this evidence can be recharacterized as a legal issue.

It's true, as we've noted, that reviewable questions of law under § 1252(a)(2)(D) include mixed questions of law and fact—that is, "the application of a legal standard to undisputed or established facts." *Guerrero-Lasprilla*, 589 U.S. at 225. But Gulomjonov neither cited *Guerrero-Lasprilla* nor made any effort to explain how the immigration judge's finding about the date of his conversion might be characterized as a mixed question of law and fact. Although we have an independent obligation to address potential *barriers* to our jurisdiction, we "need not bend over backwards to construct alternative theories" to *support* jurisdiction when the party asserting it hasn't done so. *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 718 (7th Cir. 2012). It's well established that the proponent of jurisdiction "bears the burden of demonstrating its existence." *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 679 (7th Cir. 2006). This principle applies to petitioners seeking review of agency decisions in the immigration context.

Section 1158(a)(3) is the baseline; it blocks judicial review of the immigration agency's decisions under § 1158(a)(2)—i.e., determinations regarding the timeliness of asylum applications and the discretionary exceptions to the one-year deadline. Section 1252(a)(2)(D), in turn, saves certain claims from the jurisdictional bar, but it is the petitioner's burden to "identify a legal or constitutional defect in the agency's decision [that] would allow us to review the agency's deter-

mination regarding the [asylum] application's timeliness." *López-Pérez v. Garland*, 26 F.4th 104, 111 (1st Cir. 2022) (quotation marks omitted); *see also Ixcuna-Garcia v. Garland*, 25 F.4th 38, 44–45 (1st Cir. 2022) ("The key that unlocks federal court review in such cases is a colorable constitutional or legal question that is not simply a thinly-veiled challenge to the [immigration judge's] factfinding." (quotation marks omitted)).

Accordingly, Gulomjonov had the burden to identify a reviewable constitutional claim or legal argument notwithstanding the general jurisdictional bar. His argument about the validity of the reasonable-time regulation fits the bill; we have addressed and rejected that claim on the merits. His fallback argument about the date of his religious conversion does not.[4]

## B.  Withholding of Removal and CAT Relief

Gulomjonov also challenges the denial of his claims for withholding of removal and relief under the torture convention. He claims that the immigration judge misconstrued the evidence about the treatment of Catholics in Uzbekistan. The

---

[4] In an undeveloped argument, Gulomjonov briefly mentions the claim he raised for the first time before the Board: that certain other factors— his young age, immigration detention, and maintenance of lawful nonimmigrant status through January 2019—should be construed as extraordinary circumstances justifying agency review of his late asylum claim. As we've noted, the "extraordinary circumstances" exception to the one-year filing deadline is distinct from the "changed circumstances" exception, though they both appear in § 1158(a)(2)(D). The Board held that Gulomjonov waived this claim because he did not raise it before the immigration judge. We see no basis to disturb that ruling.

Board adopted the immigration judge's analysis while adding some of its own, so we review the judge's reasoning as supplemented by the Board's. *Khan*, 554 F.3d at 690. Our review is extremely deferential: we will reverse only if the record "*compels* a different result." *Id.* (quotation marks omitted); *see also Tsegmed v. Sessions*, 859 F.3d 480, 484, 486 (7th Cir. 2017).

Gulomjonov's argument is perfunctory. He does not engage with the record or any aspect of the agency's decision. He briefly gestures at the applicable legal standard, but he offers no analysis and does not cite any part of the 800-page administrative record. In the single page of his brief devoted to this argument, he asserts summarily that the evidence shows "various forms of abuse" and "clearly establish[es] that ethnic Uzbeks" who convert to Christianity "face[] a heightened threat of mistreatment." In other words, he contends that the agency misconstrued the evidence without pointing to a single piece of evidence that was misconstrued.

This kind of argument—undeveloped and unsupported by relevant authority or citation to the record—could be dismissed as waived. *United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023); *Cruz-Martinez v. Sessions*, 885 F.3d 460, 464 (7th Cir. 2018) (finding waiver of a claim for CAT relief where the petitioner "only generally argue[d] that the Board erred and d[id] not cite specific evidence or arguments in support of his claim that he would be subject to torture"). Waiver aside, our review of the record does not compel a different conclusion on Gulomjonov's withholding claim.

To obtain relief, Gulomjonov had the burden to show that he faces a "clear probability of future persecution" if removed to Uzbekistan, *Garcia-Arce v. Barr*, 946 F.3d 371, 377

(7th Cir. 2019) (quotation marks omitted). This, in turn, required him to produce evidence of a pattern or practice of govern-sponsored or government-tolerated persecution of Catholics in Uzbekistan—that is, "a systematic, pervasive, or organized effort" to persecute Catholics that is "perpetrated or tolerated by state actors." *Krishnapillai v. Holder*, 563 F.3d 606, 620 (7th Cir. 2009).

Gulomjonov points to no specific evidence of a systematic, pervasive, or organized effort to do severe harm to Catholics or Christians. The country reports describe harassment of and discrimination against Christians, but the immigration judge and the Board concluded that this evidence was insufficient to establish the kind and degree of severe mistreatment required to qualify for withholding of removal. Nothing in the record compels a contrary conclusion.

Finally, the Board concluded that Gulomjonov waived his CAT claim by not meaningfully challenging the immigration judge's denial of it. Gulomjonov has not addressed the Board's waiver ruling. Regardless, his failure to demonstrate a clear probability of future persecution for purposes of his withholding claim also means that he has failed to prove a likelihood of torture, as required for relief under the torture convention. *Khan*, 554 F.3d at 692. There is no basis to disturb the agency's denial of his CAT claim.

Accordingly, Gulomjonov's factual challenge to the agency's untimeliness ruling on his asylum claim is DISMISSED for lack of jurisdiction. In all other respects, his petition for review is DENIED.

RIPPLE, *Circuit Judge*. I concur in the judgment of the court. I respectfully disagree with my colleagues on one point. In my view, the petitioner adequately preserved the issue of whether he filed for asylum within a reasonable period of time after his circumstances changed. We have jurisdiction to consider this mixed question of law and fact. *See Wilkinson v. Garland*, 601 U.S. 209, 212 (2024); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 225 (2020). However, giving the determination of the Board appropriate deference, I would not disturb its conclusion that the petitioner did not file within a reasonable period of time. *See Arreola-Ochoa v. Garland*, 34 F.4th 603, 610 (7th Cir. 2022) (noting that, even after *Guerrero-Lasprilla*, "[w]e must defer to the Board's handling of this type of mixed question of law and fact").