# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3873

THERESA BROWNE BANKS,

*Petitioner,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

Petition for Review of a Decision of the
Board of Immigration Appeals

ARGUED JUNE 2, 2006—DECIDED JULY 5, 2006

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* A citizen of Liberia, Theresa Banks sought asylum on the ground that she had been persecuted on account of her ethnicity (the Krahn tribe) and her support of the Unity Party. (These groups overlap: most members of the Unity Party are ethnic Krahns.) When Banks made her application, Charles Taylor was President of Liberia, and it is undisputed that he had it in for both the Krahns and the Unity Party. Before the immigration judge held a hearing on Banks's application, however, Taylor fled the country after losing a long and bloody civil war.

Today Taylor is awaiting trial in the International Criminal Court at The Hague and Ellen Johnson Sirleaf, the Unity Party's leader, is the country's President. It is unlikely that people of Banks's background would be at significant risk in Liberia, now that the new government has had time to clean out any pockets of Taylor's partisans. Yet the immigration judge's opinion, issued in March 2004 (seven months after Taylor went into exile) mentions Taylor's departure only in passing, and the Board of Immigration Appeals, which affirmed in September 2005, did not mention these events at all. The reasons that the IJ and the BIA did give are deficient, so we must remand—for judges cannot resolve administrative litigation on grounds that the agency ignored, see *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)—even though the current political situation in Liberia means that Banks is unlikely to benefit.

Banks's claim rests on two principal episodes. To simplify the exposition we omit unnecessary detail.

The first episode is the "Camp Johnson Road incident." On September 18, 1998, Taylor's forces descended on a settlement that was populated predominantly by ethnic Krahns and political opponents of his government. Residents were raped or murdered; homes were ransacked or destroyed. Banks was away when this raid occurred and returned to discover her home in shambles, her cousin dead, and her children missing. The children turned up the next day at a friend's home. Banks and her husband had to find a new place to live and hide from Taylor's forces. The occurrence of the Camp Johnson Road incident is conceded, and the immigration judge accepted Banks's story about what happened to her cousin and her home, as well as other residents of the neighborhood. Still, the IJ concluded, this did not amount to persecution because Banks, fortuitously absent, had not suffered injury.

The second episode is a series of incidents in 2001 during which, Banks maintains, she was beaten and raped by

Taylor's forces, once being dragged to the Executive Mansion for interrogation, rape, and torture by one of Taylor's top lieutenants. Immigration Judge Vinikoor disbelieved this aspect of Banks's narrative because, he wrote, Banks had not been active politically in 2001, and it was unlikely that Taylor's forces, stretched thin by the civil war, would tarry over someone who was not an immediate threat. Moreover, the IJ wrote, a letter from the Unity Party describing Banks's political activities appeared to be a fake, because it placed Monrovia (the capital) in the wrong county. The apparent fabrication of this document was especially important to the BIA, whose opinion mentioned scarcely anything else.

The agency's handling of the Camp Johnson Road incident is hard to fathom. Banks did not suffer rape or a beating, but her home was destroyed—and, more to the point, the raid illustrates something that the agency concedes: *all* ethnic Krahns, and *all* supporters of the Unity Party, were unsafe in Liberia while Taylor was in charge. One would not say that a Jew was free of persecution by the Nazi government until the SS placed him in a boxcar bound for a concentration camp. That persecution may affect entire groups is the subject of a regulation, 8 C.F.R. §1208.13(b)(2)(iii):

> In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:
>
>> (A) The applicant establishes that there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant

> on account of race, religion, nationality, membership in a particular social group, or political opinion; and
>
> (B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

Immigration Judge Vinikoor did what this regulation says that an IJ "shall not" do: he required Banks to show that she had been singled out during the Camp Johnson Road incident, as opposed to being a member of two groups that were exposed to a pattern or practice of persecution. The IJ did not doubt that Taylor's government persecuted supporters of the Unity Party and persons of Krahn ethnicity; this meant that Banks's "fear of persecution upon return [was] reasonable" as long as Taylor remained in power.

Banks's lawyer did not rely on 8 C.F.R. §1208.13(b)(2)(iii) or its predecessor 8 C.F.R. §208.13(b)(2)(iii) before either the IJ or the BIA. That would be a forfeiture if the regulation were one that imposed on the alien a burden of production, burden of persuasion, or need to object. But it is not expressed as a rule of conduct for the alien. It is addressed, rather, to "the asylum officer or immigration judge" and says that these public officials "shall not require the applicant" to provide certain evidence. That rule governs not only the proofs at the hearing but also an IJ's process of reasoning, and it must be followed whether or not an alien draws it to the agency's attention. A litigant's failure to remind an IJ of some rule assuredly does not entitle the IJ to *contradict* that rule and require the very sort of proof that the regulation says he "shall not require". Banks and her lawyer preserved the contention (the claim for asylum on account of the Taylor government's treatment of its enemies); they did not need to cite each source of authority supporting their position. See *Elder v. Holloway*, 510 U.S. 510 (1994).

As for the events that Banks says occurred in 2001: here the IJ's view is stronger, for some of her documentation is suspect. If the Unity Party's letter was phony, Banks had to know it; the error is equivalent to putting Chicago in the Bronx rather than Cook County. But the IJ did not rest on documentary foibles. His principal reason for disbelieving Banks was his confidence that Taylor's forces would not have singled out someone who was by then no longer politically active and certainly would not have dragged such a person to the Executive Mansion for the personal attention of a top operative.

Doubt about Banks's veracity cannot be labeled irrational. All governments have limited manpower, and Taylor's was stretched thin by the ongoing civil war. Why devote scarce resources to terrorizing retired opponents when the time could be dedicated to active adversaries who are more dangerous to the regime? Yet Taylor's operatives may have had outdated lists of enemies; the goons he used to keep the populace in check did not receive daily updates via Blackberry! Or perhaps Taylor's regime had adopted a program of brutalizing anyone who was, or ever had been, among its enemies, all the better to dissuade citizens from going into opposition in the first place. English kings subjected opponents to a punishment known as corruption of blood (which deprived the opponents' children of inheritance) and Kim Il Sung imprisoned both children and grandchildren of his enemies; the possibility that Taylor made opposition the basis of arbitrary terror for the opponent's lifetime cannot be dismissed out of hand.

How Taylor's forces behaved is a question of fact and not of first principles; it cannot be resolved just by observing that, when resources are tight, even dictators may allow former enemies a peaceful retirement. So does substantial evidence support the IJ's (implicit) resolution of this factual question? Not remotely. William S. Reno, a professor at Northwestern University who specializes in Liberian

politics, testified as an expert on Banks's behalf that her account was entirely plausible, that the Taylor regime indeed persecuted ethnic Krahns who had withdrawn from active politics. The agency did not offer any evidence to the contrary, and the State Department's country reports for 2001 and 2002 are silent on the stance that Taylor's forces took toward persons in Banks's situation. The IJ summarized Reno's testimony at page 6 of his decision but then ignored it when analyzing Banks's claims and articulated his own contrary view, which rests on no evidence at all.

Because the State Department's country reports are so general—they may reveal which groups are at greatest risk, but not how much risk and not how the country's forces operate day-to-day—the administrative record needs concrete, case-specific evidence, the equivalent of what physicians and vocational experts supply in a Social Security disability case. An IJ is not an expert on conditions in any given country, and *a priori* views about how authoritarian regimes conduct themselves are no substitute for evidence—a point that we have made repeatedly, but which has yet to sink in. See, e.g., *Kllokoqi v. Gonzales*, 439 F.3d 336, 344 (7th Cir. 2005); *Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006); *Huang v. Gonzales*, 403 F.3d 945, 949-51 (7th Cir. 2005); *Uwase v. Ashcroft*, 349 F.3d 1039, 1042 (7th Cir. 2003).

What the immigration bureaucracy needs is a counterpart to Professor Reno for each country, someone who knows local conditions at a level of detail that would permit him to opine on the question whether a given alien's assertions are plausible, and what level of risk that alien would face if returned home. The Social Security Administration would not dream of omitting medical and vocational evidence when responding to a disability claim; the SSA knows, as many decisions hold, that ALJs cannot play doctor but must have evidence; why do immigration officials so often stand silent at asylum hearings and leave the IJ to play the role

of country specialist, a role for which an overworked lawyer who spends his life in the Midwest is so poorly suited?

Social Security officials introduced the vocational expert in 1962, after *Kerner v. Flemming*, 283 F.2d 916 (2d Cir. 1960), concluded that concrete evidence, rather than *a priori* reasoning by the hearing examiner, was essential. The agency initially responded by citing published studies and reports (just as immigration officials often rely on the State Department's country reports); when appellate courts concluded that these were too general to resolve specific claims, the agency turned to vocational experts who could apply their knowledge to each claimant's circumstances. See the SSA's house explanation at http://www.ssa.gov/history/ssa/lbjoper5.html. See also Steven Babitsky, *The Vocational Expert in Social Security Disability Cases*, 15 Trial 44 (Jan. 1979); cf. Jerry L. Mashaw, *Conflict and Compromise Among Models of Administrative Justice*, 1981 Duke L.J. 181, 182 & n.4 (1981). Twenty years later the SSA reduced many of its doctrines to rules ("the Grid"). See *Heckler v. Campbell*, 461 U.S. 458 (1983). Vocational experts remain in use, however, when the regulations—including those that classify some conditions as automatically disabling—don't provide a definite resolution.

The immigration system's consideration of asylum claims today is in much the situation as the Social Security disability system before the introduction of vocational experts. It relies on hearing officers to do the work of both creating rules (for there is no equivalent to the Grid) and supplying analysis (for there is no equivalent to the vocational expert). That requires entirely too much of a lawyer who should be a neutral adjudicator rather than a rulemaker and expert rolled together.

Many disputes about asylum are recurring and could be resolved once and for all by the Secretary of Homeland

Security, the Attorney General, and their delegates. Regulation 1208.13(b)(2)(iii) cries out for systemic decisions. While Taylor ruled Liberia, all ethnic Krahns (and Unity Party supporters) should have been treated the same way. Similarly, adherents to the Ahmadi sect either are or are not persecuted in Pakistan. We remanded in *Sahi v. Gonzales*, 416 F.3d 587 (7th Cir. 2005), because the agency had failed to confront that recurring question. Many asylum claims similarly could be handled by the sort of detailed regulations that the Social Security Administration uses. Others, of the kind that arise less frequently, could be resolved with the assistance of country specialists along the lines of vocational experts. What cannot continue, however, is administrative refusal to take a stand on recurring questions, coupled with the reliance on IJs to fill in for the expertise missing from the record. The immigration bureaucracy has much to learn from the experience of other federal agencies that handle large numbers of comparable claims with individual variations.

The petition for review is granted, and this case is remanded to the agency.

No. 05-3873                                                        9

A true Copy:

     Teste:

 

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*