In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-4135

TOMADJAH KANTONI,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,

*Respondent*.

———————

On Petition to Review an Order of the
Board of Immigration Appeals.
No. A96 149 304

———————

ARGUED AUGUST 9, 2006—DECIDED AUGUST 28, 2006

———————

Before POSNER, COFFEY, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*.  The immigration judge, seconded by the Board of Immigration Appeals, denied the petitioner's claim of asylum on the ground that she had failed to prove that she had been persecuted on the basis of her political views, as she claimed. A number of errors in the immigration judge's opinion require that we grant the petition for review and return the matter to the immigration authorities for further consideration of her claim.

Tomadjah Kantoni is a native of the African nation of Togo. She testified as follows. In 1976, when she was 18, she was selected along with other girls to dance for the presi-

dent of Togo, Gnassingbé Eyadéma. The next day he had her brought to his residence, where he raped her. She believed that his motivation in doing so was, in part anyway, to retaliate against her father for her father's having criticized the president. (She did not say so in her asylum application, but did in response to a question put to her by her lawyer at the hearing before the immigration judge.)

In 1991, she joined the Community of Action for Renewal (CAR), a political party opposed to the president. The following year her neighborhood was attacked by soldiers, who broke into homes of suspected members of the opposition. The petitioner was away at the time and it is unclear whether her home was damaged. But the workshop that she owned was destroyed after soldiers asked for the "boss" and were told she was away. Before the attack, moreover, a group of soldiers led by the president's son had come looking for her. In reaction to these events, the petitioner's husband, in fear, joined the president's party.

After this the petitioner lived at home only intermittently but continued to work for CAR, and during this period she received threatening anonymous phone calls. Then in 2002, shortly after returning from a year in the United States (where apparently she was visiting a cousin), she was arrested and jailed. The next day a man visited her in her cell and told her that persons such as herself who belonged to the same tribe as the president owed their loyalty to him and that if she didn't switch her allegiance to the president's party "very severe measures" would be taken against her. She promised to do so and was released. Later she received an anonymous phone call in which the caller threatened that she would be arrested again. She fled to the United States and sought asylum.

Two months after leaving Togo, she learned that two of her daughters who still lived there had while coming home from school with other students been accosted by three men in a car who were wearing insignia that identified them as members of the president's party. One of them got out of the car and walked up to the daughters and asked them where their mother was. They answered that she'd gone away. Not satisfied with the answer, he took one of the daughters by the hand. The two other men now left the car and approached, one of them brandishing a pair of hand-cuffs. The students began screaming and throwing rocks at the men, and were joined in this by bystanders, including women who were selling goods by the side of the road. The men were driven off. But upon learning of the incident the petitioner's husband, who was still in Togo, packed the daughters off to the neighboring country of Benin.

A professor of African history testified at the immigration hearing that political affiliations in Togo run along ethnic lines, so that a member of the president's tribe who joined the opposition would indeed be regarded as the president's enemy. The president has since died but has been succeeded by one of his sons, and there has been no change in regime policies. Apparently he is not the son who had led the raid in which the petitioner's workshop was destroyed. The son she named in both her asylum application and her testi-mony at the hearing before the immigration judge is Ernest, and the new president is Faure. At argument her lawyer said that it was a mistake and that it really was Faure who had led the raid, but this is almost certainly wrong. It is Ernest who is (or was) a military leader; Faure has a civilian background. IRINnews.org, "TOGO: Gnassingbe Digging in as the New Front Man for Togo's Long-Ruling Elite" (Feb. 19, 2005), http://www.irinnews.org/report.asp?ReportID= 45664&SelectRegion=West_Africa&SelectCountry=TOGO.

If the petitioner's testimony is believed, she was a victim of persecution because of her political views. On the critical issue of her credibility, the immigration judge remarked that he "largely accepted" her testimony as credible, but he unhelpfully failed to indicate what part of it he did not believe. At argument the government's lawyer asked us to assume that the judge thought the petitioner's testimony entirely credible. Even so, the lawyer argued, the judge was justified in inferring that the petitioner had not been persecuted in the past and had no well-founded fear of being persecuted should she be returned to Togo.

But the reasons that the judge gave for drawing these inferences are not supported by the record or consistent with his having believed the petitioner's testimony. He thought she had been raped because the president made a practice (as indeed he did) of raping girls selected to dance for him, but her testimony that the rape was connected to her father's previous criticism of the president was not inconsistent with the president's having such a practice, for it is not suggested that he raped *all* the girls who danced for him. The petitioner's testimony about the motive for the rape was speculative, and could well have been rejected on that ground; but that was not the immigration judge's ground.

Concerning the raid on the petitioner's neighborhood, the judge thought it unlikely that soldiers would ransack the entire neighborhood in order to punish her. But her testimony was that the raid was aimed at the president's opponents, not just at her. Nor did the immigration judge suggest any basis for his belief that Togolese soldiers would not ransack an entire neighborhood in search of one person. If immigration judges want to base their findings on insights into the political or military or social culture of the asylum

seeker's country, that is fine, but they must indicate a knowledge of the culture. We repeat our recent suggestion that an asylum equivalent of the Social Security Administration's vocational experts be retained to testify about relevant aspects of national culture. *Banks v. Gonzales*, 453 F.3d 449, 453-54 (7th Cir. 2006). As we pointedly remarked in *Banks*, "An IJ is not an expert on conditions in any given country, and *a priori* views about how authoritarian regimes conduct themselves are no substitute for evidence—a point that we have made repeatedly, but which has yet to sink in." *Id*. at 453.

The judge dismissed the petitioner's arrest and detention as acts of persecution because of the brevity of the detention and the fact that she was not beaten or otherwise manhandled. But the significance of the incident is that her captors gave her the bleak choice of giving up her political views or finding herself on the receiving end of "very severe measures." A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution. *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997) ("it is virtually the definition of religious persecution that the votaries of a religion are forbidden to practice it"); *Krotova v. Gonzales*, 416 F.3d 1080, 1086-87 (9th Cir. 2005); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1137 n. 6 (9th Cir. 2004). As for the judge's suggestion that the petitioner had nothing to fear because she is of the same ethnicity as the president, that is the very opposite of the truth; and likewise his statement that her fears are groundless because her husband has joined the president's party—it is her refusal to do so that endangers her.

The judge also said that if the petitioner had had any real fear of persecution, she would not have returned to Togo in 2002. But her husband and daughters were there; and it was shortly after she returned that she was arrested.

With regard to the incident with two of the daughters, the immigration judge committed two serious mistakes. The first was to say that the petitioner's testimony about the incident was too sketchy to permit an inference that it was persecution. The judge's summary of her testimony was indeed sketchy, but her testimony, which we summarized earlier, was not. It was detailed and the only inference it supported was that the president's henchmen were going to arrest the daughters in an effort to learn the whereabouts of the mother. The second mistake was his saying that the daughters were in the United States and therefore the petitioner should have brought them to the hearing so that they could fill in the missing details. By the time of the hearing, two of her daughters were in the United States, but the two daughters involved in the incident were still in Benin.

Finally, the immigration judge should not have considered each alleged incident of persecution in isolation, rather than considering what kind of pattern they composed. *Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006); *Koval v. Gonzales*, 418 F.3d 798, 806 (7th Cir. 2005); *Toure v. Attorney General of the United States*, 443 F.3d 310, 318-19 (3d Cir. 2006); *Poradisova v. Gonzales*, 420 F.3d 70, 79-80 (2d Cir. 2005); *Baballah v. Ashcroft*, 367 F.3d 1067, 1076 (9th Cir. 2004). As these cases make clear, a rape, the destruction of one's business, threats, detention, more threats, and threatened seizure of one's children, all emanating from the government and all on account (except perhaps the rape) of peaceful political opposition to the nation's ruler, add up to persecution.

When the person seeking asylum proves that she has been persecuted in the past, the burden shifts to the government to prove that she has no solid reason to fear being perse-

cuted in the future. 8 C.F.R. § 208.13(b)(1); *Cecaj v. Gonzales*, *supra*, 440 F.3d at 900. Usually the government tries to carry the burden either by showing changed conditions or by showing that the persecution of people in the petitioner's group is localized and she will be safe elsewhere in her country. Neither is suggested.

The petition for review is granted, the order of the Board of Immigration Appeals vacated, and the matter returned to the Board for further proceedings consistent with this opinion.

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*