In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 05-4437

GETU HAILU KEBE and GEDAM TESFAYE AYELE,

*Petitioners*,

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent*.

_____

Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A79 290 810, A79 290 811

_____

ARGUED DECEMBER 13, 2006—DECIDED JANUARY 19, 2007

_____

Before POSNER, MANION, and EVANS, *Circuit Judges*.

MANION, *Circuit Judge*. Getu Kebe, an Ethiopian citizen, and his wife, Gedam Tesfaye Ayele, petition for review of the order of the Board of Immigration Appeals denying their motion to reopen their claims for asylum, withholding of removal, and relief under the Convention Against Torture. Kebe's original claim was that Ethiopian authorities imprisoned and beat him because of his membership in the Oromo Liberation Front (OLF). His wife filed a derivative claim for asylum. After the BIA

affirmed the Immigration Judge's denial of all relief, Kebe
and his wife moved to reopen alleging changed country
conditions. Because, in denying the motion to reopen, the
BIA failed to analyze Kebe's evidence that conditions
for members of opposition political organizations like
OLF had worsened since the BIA's original decision, we
grant the petition and remand.

**Background**

Kebe, who is of Oromo ethnicity, has been a supporter
of the OLF since the 1990's. The OLF is an opposition
organization that supports Oromo nationalism and has
been attempting to wage an armed struggle against the
coalition that controls the Ethiopian government, the
Ethiopian People's Revolutionary Democratic Front
(EPRDF), which is dominated by the Tigrayan ethnic
group.

Kebe's support for the OLF caused him to suffer seri-
ous mistreatment at the hands of the government. He
was arrested in December 1998, held for twenty-four hours,
and interrogated about his OLF ties. After his release,
he was told to report to the police once a week. Kebe
complied for several months but then stopped because
the requirement was preventing him from running his
business. After he stopped reporting, the authorities
arrested him a second time in December 1999. This time
authorities imprisoned him for two months, beat him
with rubber truncheons, dragged him across the floor
with his hands bound, and stuffed a sock in his mouth
so he could not scream. The authorities again questioned
him about his OLF affiliation and also about why he
stopped reporting to the police. After being released from

this second imprisonment, Kebe and his wife fled to Kenya in the summer of 2000 and then came to the United States in September of that year because Kenya does not grant asylum to Ethiopians.

Kebe claimed asylum in 2001 based on his support for the OLF and his Oromo ethnicity. The IJ found Kebe credible. However, she denied his asylum claim because she decided that Kebe's second arrest and the beatings were the result of his failure to report as required rather than his OLF membership. Furthermore, she decided that he did not have a well-founded fear of future persecution because the situation in Ethiopia had improved since elections in 1995, with the government becoming more receptive to the participation of opposition groups in politics. She also concluded that "[g]eneral efforts by a government to learn about OLF activities, especially when the OLF's goal is the violent overthrow of the current Ethiopian government, is not persecutory." There was no finding, however, that Kebe himself committed acts of violence. Finally, she pointed out that Kebe's six siblings and his mother were still in Ethiopia and had not been harassed despite their Oromo ethnicity. Kebe appealed, and the BIA affirmed without opinion in March 2004.

Kebe did not petition for review of this order. Instead, after retaining new counsel, he filed a motion in August 2005 to reopen proceedings based on the ineffective assistance of his former counsel and changed country conditions in Ethiopia. Only the latter claim—changed country conditions—is at issue in this appeal.

As evidence of the changed country conditions, Kebe submitted numerous human rights reports and news articles. These indicated that violence in Ethiopia against

supporters of the political opposition had increased both before and after the opposition's unexpectedly strong showing in the most recent elections, held in May 2005. In particular, Kebe submitted news articles from the BBC and Agence France-Presse reporting on the government's alleged imprisonment, torture, and killing of members of the Coalition for Unity and Democracy (CUD), an umbrella organization of opposition political parties, in anticipation of the 2005 election. These articles also reported on the deaths of twenty-two Ethiopians which occurred after the election when police fired on people protesting government-sponsored election fraud.

Finally, Kebe has included with his appellate brief the most recent State Department Country Report on Ethiopia covering 2005. Although this report was not submitted with Kebe's motion to reopen (it had not been published at that time) we may take judicial notice of it. *See Giday v. Gonzales*, 434 F.3d 543, 556 n.6 (7th Cir. 2006). This report states that "[a]lthough there were some improvements, the government's human rights record remained poor and worsened in some areas." (Pet. App. Ex. C5 at 1.) For example, "in the period following the elections, authorities arbitrarily detained, beat, and killed opposition members . . ." and "[d]uring the year [2005] attacks by police, the army, and militia against members of the opposition and the general public escalated, particularly for demonstrations against the results of the May national elections." (*Id.* at 1, 11-12.) The report noted that although there were "numerous opposition rallies" prior to the 2005 elections, the government restricted the right to protest following the elections. (*Id.* at 11.) Finally, the report stated that the CUD umbrella coalition continued to report beatings and detentions of its members

through the fall of 2005, the end of the period that this most recent report covers.

The BIA rejected Kebe's argument with a conclusory statement that "the respondents have failed to show materially changed conditions in Ethiopia . . . ." The BIA also found that Kebe's ineffective assistance arguments could have been raised earlier.

**Analysis**

On appeal, Kebe's sole contention is that the BIA erred by rejecting his claim of changed country conditions since 2005 without discussing any of the new evidence which, he says, shows that conditions have worsened since the BIA's initial decision rejecting his asylum claim in 2004.

This court reviews the denial of a motion to reopen for abuse of discretion. *Patel v. Gonzales*, 442 F.3d 1011, 1016 (7th Cir. 2006). A motion to reopen may be granted if the applicant presents material evidence of changed country conditions that was unavailable at the time of his previous hearing. 8 C.F.R. § 1003.2(c)(3)(ii); *Zhao v. Gonzales*, 440 F.3d 405, 407 (7th Cir. 2005) (per curiam). In this case, the BIA's denial of Kebe's motion based on changed country conditions did not discuss or analyze any of Kebe's evidence suggesting that both before and after the elections in 2005 the Ethiopian government launched increased repression of opposition groups compared to the situation in 2004. Although the BIA might have offered reasons for rejecting the evidence of changed conditions, or for denying relief despite changed conditions, the absence of any articulated reasons in the BIA's decision constitutes an abuse of discretion and requires a remand.

We have held that, although the BIA does not have to "write an exegesis on every contention," it must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (internal citation and quotation marks omitted). We have frequently remanded cases when the BIA's or the IJ's failure to discuss potentially meritorious arguments or evidence calls into question whether it adequately considered these arguments. *See Sosnovskaia v. Gonzales*, 421 F.3d 589, 593 (7th Cir. 2005) (refusing to accept IJ's conclusion that conditions in applicant's native Ukraine had changed enough to negate her well-founded fear of persecution based on her Jewish religion when IJ ignored applicant's evidence of current anti-Semitism in Ukraine); *Fessehaye v. Gonzales*, 414 F.3d 746, 750, 754-55 (7th Cir. 2005) (remanding because BIA refused to reopen proceedings based on applicant's post-proceeding conversion to a Jehovah's Witness when applicant provided affidavit testifying to her conversion, and BIA did not explain why it found her evidence of conversion insufficient); *Brucaj v. Ashcroft*, 381 F.3d 602, 609-11 (7th Cir. 2004) (remanding because BIA denied applicant's claim for humanitarian asylum giving only a "cursory" explanation of its decision that did "little more than paraphrase the language of the applicable regulation" and the basis for the decision was not clear from the record).

Kebe's evidence about the situation leading up to and following the 2005 elections post-dates not only his original hearing before the IJ but also the BIA's ruling on his direct appeal. Furthermore, it is material. The information arguably shows that the government sought to imprison

and torture opposition members in the period leading up to the 2005 elections. It also shows that after the election, when the opposition did better than expected, the government violently attacked and killed opposition protesters, restricted freedom of assembly, and continued to imprison and assault opposition politicians. The information thus suggests that in the time since the BIA's original decision on Kebe's asylum application, the government has become even more aggressive about cracking down on opposition groups, especially now that the success of these groups in the 2005 election has shown them to be a realistic threat to the government's power.

Kebe's materials also show that the Ethiopian government has long considered the OLF to be an organization that needs to be violently suppressed. For example, Human Rights Watch reports that the government created a rival Oromo political party to marginalize the OLF and justified imprisoning and torturing government opponents because of their purported support of OLF. Therefore, it is reasonable to infer from Kebe's materials that a more dangerous situation for opposition political groups in general also means a more dangerous situation for anti-government OLF supporters like Kebe. Finally, and most importantly, Kebe's testimony at his asylum hearing about the beating and imprisonment that he suffered shows an increased likelihood that he in particular will be singled out for persecution in this heightened climate of violence against the opposition. In spite of all this, the BIA never discussed or analyzed the new and recent information of increased anti-opposition violence and repression that Kebe submitted, calling into question whether it considered Kebe's arguments. Accordingly, a remand is necessary to direct the BIA to consider this

evidence and evaluate its significance. *See Brucaj*, 381 F.3d at 609-11.

We stress that Kebe's new evidence does not necessarily entitle him to a reopening of his asylum proceedings. We also stress that we are not suggesting that all Oromos, or even all OLF supporters, are entitled to asylum given the developments following the 2005 elections. We merely hold that, in light of Kebe's past experiences of mistreatment, the BIA should have specifically responded to the significant, material evidence that Kebe submitted suggesting that conditions in Ethiopia had changed for the worse. Therefore, we GRANT THE PETITION and REMAND for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*