# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2673

GUILLERMO AGUILAR-MEJIA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A071-312-010

ARGUED JANUARY 19, 2010—DECIDED AUGUST 6, 2010

Before BAUER and WOOD, *Circuit Judges*, and KENNELLY,
*District Judge*.*

WOOD, *Circuit Judge*. Guillermo Aguilar-Mejia, also
known as Williams Oswaldo Aguilar-Mejia, is fighting
removal from the United States. He came to this country

---

* Hon. Matthew F. Kennelly, District Judge for the Northern
District of Illinois, sitting by designation.

in the late 1980s, and was removed to Mexico in 1995. He returned shortly thereafter and has remained here ever since. Life is hard for Aguilar-Mejia. He was diagnosed with HIV/AIDS and, later, with a debilitating viral disease that causes the brain's white matter to deteriorate. Thankfully, Aguilar-Mejia has found the support of various organizations and persons in the Chicago area that have provided him with the medical, economic, and psychological support he needs. After a 2008 arrest, however, the Department of Homeland Security sought to have him removed based on, among other grounds, a previous conviction for drug possession.

Aguilar-Mejia did not challenge the charges before the Immigration Judge ("IJ"), but he argued that he qualified for withholding of removal and protection under the Convention Against Torture ("CAT"). Aguilar-Mejia focused on the threat of persecution against perceived homosexuals and persons suffering from AIDS. An IJ in Chicago found Aguilar-Mejia removable and denied his application for withholding of removal because he failed to establish a pattern or practice of persecution against those groups in the designated countries. The IJ also denied the CAT claim. Aguilar-Mejia appealed to the Board of Immigration Appeals ("BIA"), but the BIA affirmed the IJ. Now he has filed a petition for review with this court. Aguilar-Mejia faces a troubling predicament, but our review is tightly constrained. Because we conclude that we lack jurisdiction over Aguilar-Mejia's factual and legal claims, we dismiss the petition for review.

**I**

Aguilar-Mejia was born in Colombia and raised in Guatemala. He was abused by his mother and stepfather. In 1988 or 1989, Aguilar-Mejia left Guatemala and traveled through Mexico to the United States, eventually settling in Chicago. In 1995, Aguilar-Mejia was convicted of possession of a controlled substance and removed to Mexico. Sometime thereafter he reentered the United States. He was arrested again in 1999, but stayed in the country.

In the years that followed, Aguilar-Mejia began to experience various symptoms that he was not able to understand for a time. In 2005, the unfortunate truth emerged: he was infected with HIV and had developed AIDS. Later, he was diagnosed with Progressive Multifocal Leukoencephalopathy ("PML"), a rare and often fatal viral disease characterized by progressive damage of the brain's white matter. This is a life-threatening disease, as the description from the National Institute of Neurological Disorders and Stroke makes clear:

> Progressive multifocal leukoencephalopathy (PML) is caused by the reactivation of a common virus in the central nervous system of immune-compromised individuals. . . . PML is most common among individuals with acquired immune deficiency syndrome (AIDS). Studies estimate that prior to effective antiretroviral therapy, as many as 5 percent of people with AIDS eventually developed PML. For them, the disease was most often rapidly fatal.

> With current HIV therapy, which effectively restores immune system function, as many as half of all HIV-PML patients survive, although they sometimes have an inflammatory reaction in the regions affected by PML. The symptoms of PML are the result of an infection that causes the loss of white matter (which is made up of myelin, a substance th[at] surrounds and protects nerve fibers) in multiple areas of the brain. Without the protection of myelin, nerve signals can't travel successfully from the brain to the rest of the body. Typical symptoms associated with PML are diverse, since they are related to the location and amount of damage in the brain, and evolve over the course of several days to several weeks. The most prominent symptoms are clumsiness; progressive weakness; and visual, speech, and sometimes, personality changes. The progression of deficits leads to life-threatening disability and death over weeks to months.

See http://www.ninds.nih.gov/disorders/pml/pml.htm (last visited Aug. 3, 2010).

Aguilar-Mejia has many of the symptoms that the Institute described. He has had problems with his memory, has been diagnosed with clinical depression, has experienced various other health problems including a severe stroke followed by a five-day coma, and has attempted suicide at least once. The record in this case is uneven because Aguilar-Mejia's memory problems make it difficult to determine all of the relevant facts.

In 2008, Aguilar-Mejia was arrested for possession of false identification and drinking alcohol in public. Aguilar-

Mejia tried to excuse his conduct by saying that he needed the ID in order to obtain an apartment. Following that arrest, the government sought to remove him to Guatemala, Colombia, or Mexico. It offered four bases for the proposed action: seeking admission within 10 years of previous removal, 8 U.S.C. § 1182(a)(9)(A)(ii); entering the United States without inspection, *id.* § 1182(a)(6)(A)(i); commission of a crime involving moral turpitude, *id.* § 1182(a)(2)(A)(i)(I); and commission of a controlled-substance offense, *id.* § 1182(a)(2)(A)(i)(II).

Aguilar-Mejia did not challenge these charges; in fact, he conceded removability based on the crime of moral turpitude and the controlled-substance offense. Instead, Aguilar-Mejia requested withholding of removal and protection under the CAT. His arguments focused exclusively on his fear of future persecution based on his membership in two groups: perceived homosexuals and persons with AIDS. Aguilar-Mejia presented a voluminous written record, called five witnesses, and testified himself. The evidence established Aguilar-Mejia's diagnoses of HIV/AIDS and PML, his dire and deteriorating condition, the extensive medical treatment he required to stave off death, the severe difficulty of accessing that treatment in the countries to which the government was proposing to remove him, and the societal stigma and mistreatment of people belonging to the social groups he had identified. At all times, Aguilar-Mejia (through counsel) argued that there was a pattern or practice of persecution directed at the social groups he had identified; he did not assert that there was any reason that he would be singled out for persecution

more than others in his groups. When the IJ asked Aguilar-Mejia's counsel directly whether his claim was limited to the "pattern-or-practice" theory, counsel answered in the affirmative.

On February 13, 2009, the IJ issued an oral decision denying relief. The IJ first found that Aguilar-Mejia was removable on all four charges. Aguilar-Mejia does not challenge any of these grounds for removal in his petition.

The IJ next turned to Aguilar-Mejia's request for withholding of removal. Because Aguilar-Mejia did not present evidence of past persecution, the IJ looked only to future persecution based on the "pattern or practice" of persecution of persons perceived to be homosexuals and persons with AIDS in the countries designated for removal. The IJ determined that Aguilar-Mejia qualified as a member of both groups, and that these groups constituted "social groups" for purposes of the withholding-of-removal regulations. The IJ was sympathetic to Aguilar-Mejia's case, but in the end he decided that there was not enough evidence of a pattern or practice of persecution to warrant withholding of removal. Although the IJ acknowledged the difficulty Aguilar-Mejia may face in obtaining the necessary medications upon removal, he decided that these circumstances did not establish the threat of persecution required for withholding of removal. The IJ also found that the CAT was inapplicable because Aguilar-Mejia did not establish that the governments of the target countries would commit or acquiesce to the commission of torture against members of either social group. The IJ noted that Aguilar-Mejia

was not eligible for asylum, because he did not file his application within one year of entry into the United States. (There was no evidence of changed country conditions in the proposed recipient countries.)

Aguilar-Mejia appealed to the BIA, again arguing the pattern-or-practice theory for withholding of removal. The BIA agreed with the IJ. Aguilar-Mejia has now filed a petition for review, with the help of the National Immigrant Justice Center ("NIJC") as *amicus curiae*. He asks this court to reject the IJ's and BIA's decisions on withholding of removal, either based on the sufficiency of the evidence or a claim of legal error. Aguilar-Mejia did not raise any issues particular to the CAT or asylum on appeal to the BIA, nor does he raise those issues in this court. We conclude that we lack jurisdiction to review the sufficiency of the evidence under the statute, and that Aguilar-Mejia failed to preserve the claim of legal error he raises in this court.

## II

An applicant for withholding of removal must establish that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b). Past persecution creates a rebuttable presumption of the threat of future persecution. *Id.* § 1208.16(b)(1). If the applicant cannot show past persecution, then he or she may present other evidence supporting an inference of future persecution. *Id.* § 1208.16(b)(2).

Aguilar-Mejia's request for withholding of removal is based on a future-persecution claim. According to the regulation, an applicant "may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of . . . membership in a particular social group . . . upon removal to that country." *Id.* This provision calls for an individualized assessment of the evidence that could establish that a petitioner may suffer future persecution. The regulations go on to say, however, that the agency "shall not require the applicant to provide evidence that he or she would be singled out individually" if he or she will, more likely than not, be associated with a group that is the object of a pattern or practice of persecution. *Id.* Both of these methods of establishing future persecution are relevant to Aguilar-Mejia's petition for review.

Before assessing Aguilar-Mejia's assertion that he is entitled to relief because he faces future persecution, we must establish the boundaries of our jurisdiction. Congress has stripped courts of appeals of their jurisdiction to review most issues related to removal orders for aliens convicted of certain crimes, including controlled-substance offenses and aggravated felonies, as well as removal orders based on discretionary decisions of the Attorney General. 8 U.S.C. § 1252(a)(2)(B), (C). See, *e.g.*, *Calcano-Martinez v. INS*, 533 U.S. 348, 351 (2001); *Petrov v. Gonzales*, 464 F.3d 800, 802 (7th Cir. 2006) (applying the jurisdiction-stripping statute to an alien removed for commission of an aggravated felony whether

or not the agency made a discretionary decision). Our review in these circumstances is limited to "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). See *Mireles v. Gonzales,* 433 F.3d 965, 969 (7th Cir. 2006) (exercising jurisdiction to address petitioner's "constitutional claims or questions of law," and recognizing the lack of jurisdiction over other claims); *Hamid v. Gonzales,* 417 F.3d 642, 645-47 (7th Cir. 2005) (same).

Aguilar-Mejia was found removable for, among other reasons, his prior conviction for possession of a controlled substance. See 8 U.S.C. § 1182(a)(2)(A)(i)(II). He conceded this charge; this concession means that our jurisdiction is limited to those portions of the petition that raise constitutional claims or questions of law.

Returning to the two methods of establishing future persecution, Aguilar-Mejia devotes a large portion of his brief to evidence supporting the proposition that there is a pattern or practice of persecution against his social groups in the countries to which he might be removed. Aguilar-Mejia may well be correct, but the problem is that this is a fact-based argument, and we have no jurisdiction to entertain it. Section 1252(a)(2)(D) authorizes review only over constitutional claims or questions of law.

With respect to the other method of establishing persecution, Aguilar-Mejia has raised a legitimate legal issue: he argues that the agency made an error of law when it looked only at the threat to his social group and failed to make a finding on the *individualized* threat of future

persecution. In essence, this is a point about the agency's duty to consider issues that were not highlighted by either party, and so it is worth a brief discussion. As stated above, the regulation governing withholding of removal provides that a petitioner may establish future persecution either through the individual method or the pattern-or-practice method. 8 C.F.R. § 1208.16(b)(2). In *Banks v. Gonzales*, 453 F.3d 449 (7th Cir. 2006), we held that the asylum regulations—which mirror the withholding-of-removal regulations in all respects relevant to this issue—require the agency to make a finding on the pattern-or-practice theory whether or not the petitioner draws the rule to the agency's attention. See 8 C.F.R. § 1208.13(b)(2)(iii) ("[T]he asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility that he or she would be singled out individually for persecution if: (A) [t]he applicant establishes that there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant . . . ."). Failing to heed the command of the regulations is a legal error and grounds for the court of appeals to grant the petition and remand the case for further proceedings. See *Banks*, 453 F.3d at 452-55.

Banks argued that the agency focused only on the individual threat of persecution and ignored the pattern-or-practice theory. Aguilar-Mejia makes the opposite argument; he argues that the agency focused only on the pattern-or-practice theory and ignored the individual threat of persecution. *Banks* found that the ap-

plicable regulations required the agency to address pattern-or-practice evidence, *id.* at 452-53, and Aguilar-Mejia asks us to hold that the removal regulations command the agency to address individualized evidence, again regardless whether the petitioner asks for this relief. Even if the argument that the regulations require the evaluation of individual evidence is weaker than the *Banks* case, the case for some individualized assessment is not wholly without merit. The relevant paragraph's *chapeau* provides that "[t]he evidence *shall* be evaluated as follows," 8 C.F.R. § 1208.16(b) (emphasis added), and Aguilar-Mejia has a point when he argues that it would be odd to require the agency to evaluate generalizable (pattern or practice) evidence but then to allow the agency to ignore evidence specific to the petitioner before it.

Even though this argument, advanced by both Aguilar-Mejia and the NIJC, may rest on a serious question of law, however, it runs up against another obstacle. According to 8 U.S.C. § 1252(d)(1), the court of appeals may review a final order of removal only if the alien has exhausted the administrative remedies. What it takes to exhaust those remedies sufficiently will vary, depending on the circumstances. In *Banks*, for example, we noted that "[a] litigant's failure to remind an IJ of some rule assuredly does not entitle the IJ to *contradict* that rule," 453 F.3d at 452, but we still required the applicant to preserve the issue. See *id.* at 453 ("Banks and her lawyer preserved the contention (the claim for asylum on account of the Taylor government's treat-

ment of its enemies); they did not need to cite each source of authority supporting their position.").

Here, Aguilar-Mejia did nothing of the sort. Throughout his oral and written advocacy, Aguilar-Mejia's counsel exclusively argued the pattern-or-practice theory. After hearing the evidence, the IJ summarized what he understood to be Aguilar-Mejia's argument: "that there's a pattern and practice of persecution against people with AIDS or perceived homosexuality, therefore, members of a particular social group." The IJ sought confirmation from Aguilar-Mejia's counsel: "Is that your argument?" Counsel replied: "That is exactly our argument, Your Honor." At oral argument before this court, Aguilar-Mejia suggested that the IJ should have inferred the individual-persecution argument from his presentation of individualized evidence. But even if we were to accept this argument with respect to the IJ, Aguilar-Mejia also failed to preserve the argument on appeal to the BIA; his brief to the BIA stated flatly "there is one issue on appeal before the Board: Whether the immigration judge erred in determining that Respondent had not met his burden of proof of establishing a pattern and practice of persecution against members of his recognized particular social group" under 8 C.F.R. § 1208.16(b)(2)(i). Issues not raised to the BIA are not available for our review.

In short, Aguilar-Mejia did not preserve the individual-persecution issue. We cannot say that the agency made a legal error by failing to consider an argument when it went out of its way to confirm that Aguilar-Mejia was arguing only a different theory of the case.

Although we must deny Aguilar-Mejia's petition, we close by noting that we are aware of the exceptional humanitarian concerns raised in this case. PML is an extremely serious disease; Aguilar-Mejia's condition is severe, and could rapidly deteriorate if he loses his access to the antiretroviral therapy discussed by the National Institute of Neurological Disorders and Stroke, *supra.* (Even with state-of-the-art therapy, his chances of survival over the next year may be only 50-50.) Because he is not only HIV-positive but also suffers from full-blown AIDS, Aguilar-Mejia also needs medication that is likely not to be available to him if he is removed. Missing his medication for even a brief period could be a literal death sentence. As the IJ noted, "almost all of [Aguilar-Mejia's] witnesses testified that . . . the treatment [for AIDS] is not easily accessed and not readily available" in the countries designated for removal. For these reasons, we respectfully encourage the Attorney General, if asked by Aguilar-Mejia, to consider "deferred action," "humanitarian parole," or any other discretionary remedy that may be granted on humanitarian grounds. See, *e.g.*, Recommendation from the CIS Ombudsman to the Director, USCIS, Apr. 6, 2007, http://www.dhs.gov/xlibrary/assets/CISOmbudsman_RR_ 32_O_Deferred_Action_04-06-07.pdf (last visited Aug. 3, 2010) (describing the deferred action); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484-85 (1999) (quoting 6 C. GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03[2][a] (1998)) (same); *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999) (discussing humanitarian parole).

*  *  *

Aguilar-Mejia's petition for review is DISMISSED for lack of jurisdiction.