NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 13, 2012
Decided February 6, 2013

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-1465

| | |
|---|---|
| SADRUDDIN NOORANI, *Petitioner,* | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | No. A093 042 556 |
| ERIC H. HOLDER, JR., Attorney General of the United States *Respondent.* | |

### O R D E R

Sadruddin Noorani, a Pakistani citizen, petitions for review of an order of the Board of Immigration Appeals denying his application for asylum and withholding of removal. Because the Board failed to consider Noorani's argument that he faces persecution because of his membership in a social group—spies or agents of the United States in Pakistan—or his evidence of a pattern or practice of persecution against this social group, we grant the petition for review.

## I.     Background

Noorani first entered the United States in 1981 while working as a crewman on a Greek merchant ship that traveled to port cities around the world. In 1983 he returned to Pakistan to

marry his wife Rukhsana. They soon reentered the United States, settled in Chicago, and have lived in the area ever since with their three sons, two of whom are U.S. citizens.

In 2006, Noorani was indicted on various fraud counts in the Northern District of Illinois. He later pled guilty to one count of making a false statement in his Application to Register Permanent Resident or Adjust Status in violation of 18 U.S.C. § 1546(a). The Department of Homeland Security (DHS ) served Noorani with a Notice to Appear charging him with removability on several grounds, including being an alien who has admitted committing a crime of moral turpitude, 8 U.S.C. § 1182(a)(2)(A)(i)(I). Noorani then applied for asylum and withholding of removal based on a fear of future persecution on account of race, religion, political opinion, and membership in a social group.

After arriving in the United States nearly 30 years ago, Noorani involved himself in political and community activities. At various points he joined community organizations, including the Asian American Coalition of Chicago, for which he served as executive director. Through these community activities, he worked with numerous Chicago politicians, including Illinois Secretary of State Jesse White, former Illinois Governor Jim Edgar, and U.S. Representative Janice Schakowsky (who testified on Noorani's behalf at one of the hearings before the IJ). He also regularly appeared on media outlets directed at the Pakistani community. For example, Muja Ghazi (a radio talk-show host) testified on Noorani's behalf before the IJ and noted that since 1997, Noorani has been a regular contributor on constitutional and immigration issues to his weekly show, which typically draws around forty to fifty thousand listeners from the Chicago Pakistani and Urdu-speaking Indian populations.

For more than twenty years, Noorani also volunteered for the United States Immigration and Naturalization Service (now DHS) by serving as a community-based-organization liaison. He distributed materials from DHS to the community and apprised DHS of issues that most concerned the community. Noorani played an important role in DHS's efforts to promote the National Security Entry-Exit Registration System (NSEERS), a system initiated in 2002 for registering certain non-citizens, including U.S.-based Pakistanis. In 2003 DHS officials asked Noorani to introduce the NSEERS program to the Pakistani community. Noorani agreed, and organized and spoke at several events targeted at the Pakistani community, including a seminar that drew about 1,000 people. At these events he introduced DHS officials and actively encouraged Pakistanis to participate in NSEERS. Noorani personally assisted around 200 people with the registration process, and often promoted the program on Ghazi's radio show. His extensive activities and advocacy of NSEERS were even spotlighted in a chapter of a book discussing the impact of post-9/11 policies on people targeted because of immigration status, nationality, and religion. Tram Nguyen, *We Are All Suspects Now: Untold Stories from Immigrant Communities After 9/11* 45–71 (2005).

Beginning in 2003—after attending a five-week training course called the Citizens Academy—Noorani began conducting community outreach programs for the FBI. Over seven years, which spanned the time of his indictment and conviction, he hosted approximately 30 of these events, addressing the Pakistani community's concerns about FBI targeting and encouraging individuals to trust the FBI. When attending these events Noorani wore clothing issued by the FBI and bearing its insignia as well as a badge.

As a result of his promotion of NSEERS and his frequent public association with DHS and the FBI during seminars and community events, Noorani became a polarizing figure within the Pakistani community. Some people labeled him an agent of DHS or the FBI, and even an undercover CIA agent. He also began receiving threats, including death threats, from individuals who were in removal proceedings after having taken his advice and participated in NSEERS. Noorani informed Chicago police of one such death threat, from a man named Ahmed Raees (who was later allegedly removed to Pakistan). Tariq Khawaja, who runs the ethnic newspaper "Urdu Times," also testified to receiving several calls in which people referred to Noorani as a U.S. government agent, and warned that his pro-NSEERS activities would endanger him if he returned to Pakistan. Ghazi often heard complaints on his radio show about Noorani and believes that a segment of the Pakistani community disliked and blamed him for the removal of their family members.

In addition to the threats from individuals in the United States, Noorani also learned of animosity towards him in Pakistan. Ghazi testified that when he returned to Pakistan in 2008, three people told him that they would harm Noorani if he tried to return. Noorani's sister-in-law in Pakistan also warned him that he would not be safe if he returned to the country. She told Noorani that people would learn of his arrival and harm him because of his affiliations with DHS and the FBI.

Noorani also offered evidence of a pattern or practice of persecution against U.S. sympathizers in Pakistan, including an article about a woman killed because she was suspected to be a U.S. spy and the testimony of an expert on the current political situation in Pakistan, Dr. Sumit Ganguly, a political scientist at Indiana University. Dr. Ganguly opined that Noorani would face persecution both from individuals resentful of his involvement with NSEERS and Islamist and terrorist groups bent on harming individuals associated with U.S. law enforcement. Dr. Ganguly noted that Pakistan faced significant political turmoil and pervasive anti-American and anti-Western sentiment. He also discussed the power and influence of Islamist and terrorist groups throughout Pakistan, noting that these groups often target and kill westerners (especially those connected with United States law enforcement agencies) and operate in every area of the country. Taking into account Noorani's political activities and participation in NSEERS, Dr. Ganguly concluded that, because of "dense personal and social networks," word of Noorani's return to Pakistan would likely spread quickly, exposing him to

violence by deportees and Islamist groups. Finally, he opined that internal relocation would not hide Noorani from his potential persecutors.

The IJ denied Noorani's application for asylum and withholding. The IJ concluded that Noorani was ineligible for asylum because he applied more than one year after arriving in the United States, see 8 U.S.C. § 1158(a)(2)(B), and no changed circumstances in Pakistan justified this tardiness, see 8 U.S.C. § 1158(a)(2)(D). On the issue of withholding removal, the IJ found that Noorani had not shown a clear probability that any people or groups would seek to persecute him in Pakistan on account of political opinion or belonging to a particular social group. In deciding Noorani's social group claim, the IJ relied heavily on a social visibility analysis and emphasized that Noorani could not show a clear likelihood of persecution because his fear of retribution by deportees from Chicago was purely conjectural and unlikely (given their small number compared to Pakistan's overall population). Though Noorani's brief to the IJ argued that his evidence demonstrated "a high likelihood of persecution against individuals who are viewed as pro-American supporters," and recounted much of the pattern-or-practice evidence discussed above, the IJ did not comment on that aspect of Noorani's claim. Finally, the IJ noted that Noorani had not shown that relocating within Pakistan would be unreasonable.

The Board dismissed Noorani's appeal. It agreed with the IJ that Noorani had not shown changed or extraordinary circumstances that would excuse the untimely filing of his asylum application. The Board also agreed that Noorani had not established eligibility for withholding of removal because he failed to demonstrate a clear probability of persecution by not showing that deportees from Chicago, or anti-American, terrorist groups would learn of his return. The Board did not discuss Noorani's social group claim, apart from stating in a single-sentence footnote that Noorani had not raised the claim on appeal. In another short footnote, the Board decided that Noorani had waived his pattern-or-practice argument by not adequately addressing it before the IJ. Finally, the Board said that Noorani could reasonably relocate within Pakistan by using the skills he exhibited as a community organizer, as well as financial resources from his family in the United States.

## II.      Analysis

Before assessing Noorani's contentions, we must first consider our jurisdiction over the claims in this petition. When an individual like Noorani is removable from the United States for committing a crime of moral turpitude, 8 U.S.C. § 1252(a)(2)(C), (D), the Immigration and Nationality Act severely curtails this court's ability to review the decisions of the IJ and the Board. We may not question the factual determinations made by either body, 8 U.S.C. § 1252(a)(2)(C), such as the "manner in which the agency weighed the various factors that inform the exercise of its discretion." *Khan v. Filip*, 554 F.3d 681, 688–689 (7th Cir. 2009). But we

retain authority to review the agency's judgment for legal errors, 8 U.S.C. § 1252(a)(2)(D); *Aguilar-Mejia v. Holder*, 616 F.3d 699, 703 (7th Cir. 2010), including challenges to the interpretation of statutes and regulations or the Board's exercise of discretion if it completely ignores a petitioner's arguments, see *Kiorkis v. Holder*, 634 F.3d 924, 928 (7th Cir. 2011) (internal quotations omitted), or evidence, see *Escobar v. Holder*, 657 F.3d 537, 544 (7th Cir. 2011); *Iglesias v. Mukasey*, 540 F.3d 528, 531 (7th Cir. 2008).

Two of Noorani's arguments for withholding of removal assert that the Board simply failed to exercise its discretion—by declining to address his proposed social group (perceived United States agents and spies in Pakistan) and his evidence of a pattern or practice in Pakistan of persecuting that social group. We have jurisdiction to review both of them.[1] This court has frequently exercised jurisdiction over cases (and remanded them) "when the BIA's or the IJ's failure to discuss potentially meritorious arguments or evidence calls into question whether it adequately considered these arguments." *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007).

### A.    Cognizable Social Group

Noorani argues that the Board erred by failing to address his proposed social group because he adequately described the group in his brief to the Board as consisting of United States supporters and their subgroup, perceived United States agents and spies. But the Board concluded that Noorani had not raised the issue whether he proposed a cognizable social group, and so declined to address it. The Board must, however, address all potentially meritorious claims raised by an applicant. See *Kebe*, 473 F.3d at 857. And here Noorani did introduce his social group arguments, contending that the IJ misapprehended that group as consisting not of Pakistanis collaborating or perceived to be collaborating with the U.S. government but of potential persecutors, including individual deportees whom Noorani had encouraged to participate in NSEERS. (Pet'r's Br. to BIA, at 25–26). The Board erred by failing to consider these arguments.

### B.    Pattern-or-Practice Evidence

Noorani also contends that the Board erred by ignoring his evidence of a pattern or practice of persecution in Pakistan against U.S. collaborators. If an applicant cannot show that he would be singled out for persecution, he may still qualify for withholding of removal if he

---

[1] Noorani's other contentions—concerning his ability to relocate within Pakistan or avail himself of the protection of the Pakistani government—seek to recast factual disputes as legal questions. These contentions challenge only the agency's weighing of evidence and thus cannot be reviewed by this court. See *Khan*, 554 F.3d at 688–689.

establishes "a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of . . . membership in a particular social group." 8 C.F.R. § 1208.16(b)(2); see *Banks v. Gonzales*, 453 F.3d 449, 452 (7th Cir. 2006) (discussing analogous regulation for asylum context). Noorani pointed the Board to his evidence of the persecution faced by people who have collaborated with U.S. law enforcement. Specifically, he noted the testimony of Dr. Ganguly about violence directed at people associated with U.S. law enforcement by Islamist groups (whom the Pakistani government tolerates and cannot control), as well as numerous governmental documents and news accounts discussing the threats to pro-American Pakistanis, including an article about a woman who was executed as a suspected U.S. spy in 2008. Moreover, Noorani preserved his pattern-or-practice arguments, see *Aguilar-Mejia*, 616 F.3d at 704; *Banks*, 453 F.3d at 452–453, by presenting this evidence to the IJ and arguing that such evidence demonstrated "a high likelihood of persecution against individuals who are viewed as pro-American supporters."

But we do not believe that the Board exercised its discretion in considering whether Noorani's evidence established a pattern or practice of persecution. The Board noted in a single cursory sentence in a footnote that "because respondent has not established that he would be recognized as pro-American, he has not shown that he would be included in the group of persons identifiable with the United States or Western policies." This statement glossed over Noorani's evidence of the threat faced by U.S. collaborators in Pakistan and did not address why the Board concluded that Noorani could not belong to a social group of actual or perceived U.S. collaborators. Noorani had already testified credibly (according to the IJ) that he had worked for years with both DHS and the FBI, appeared in public with officials from both organizations, worn clothing bearing the FBI's insignia at events with that organization, and been described as an agent of the U.S. government by Pakistanis in Chicago. The Board's passing reference to pattern or practice does not demonstrate that it actually exercised its discretion. See *Lam v. Holder*, 698 F.3d 529, 534-35 (7th Cir. 2012); *Kebe*, 473 F.3d at 857.[2]

### C.     Harmless Error

---

[2] In its footnote addressing pattern or practice, the Board appears to have replicated the IJ's error of applying a social visibility analysis to Noorani's social group claim. The Board concluded that Noorani could not establish inclusion in the social group of U.S. collaborators without showing that "he would be *recognized* as pro-American." But this court has rejected a social visibility analysis and concluded that applicants need not show that they would be *recognized* as members of a social group to qualify for withholding. See *Gatimi v. Holder*, 578 F.3d 611, 614–15 (7th Cir. 2009) (noting that homosexuals in homophobic societies might well pass as heterosexual, and women who have not yet undergone genital mutilation look no different than other women).

The government contends that remand would be inappropriate in light of the Board's conclusion that Noorani had not shown a clear probability that people who blame him for their removal from the United States or anti-American, terrorist groups would learn of his return to Pakistan. To the extent that Noorani relies on proof that he would be singled out for persecution, the government's position has merit. See *Kone v. Holder*, 620 F.3d 760, 763–64 (7th Cir. 2010). But the Board's errors were not harmless if considered in the context of a pattern-or-practice claim, which requires a showing of persecution against *similarly situated* individuals, rather than proof that Noorani would himself be discovered to be or targeted as an agent of the United States. See 8 C.F.R. § 1208.16(b)(2); *Banks*, 453 F.3d at 452. Because the Board has yet to address this or Noorani's social group claim, the case must be remanded for further proceedings. On remand Noorani will need to show that his evidence amounts to proof of state actors engaging in or tolerating a "systemic, pervasive, or organized effort to kill, imprison, or severely injure" members of that group. *Pathmakanthan v. Holder*, 612 F.3d 618, 624–25 (7th Cir. 2010) (internal quotations omitted). But the Board was required to consider such evidence and its failure to do so or to address his argument based on social group membership was not harmless error.

### III.     Conclusion

Accordingly, we **GRANT** Noorani's petition for review and **REMAND** to the agency to evaluate Noorani's proposed social group and his evidence of a pattern or practice of persecution against such a group in Pakistan.